Cape and others, Trustees, Appellants, vs. Plymouth Con-
gregational Church and others, Respondents.

*November 12—December 4, 1906.*

*Appeal and error: Trial after reversal: Law of the case: Religious
societies: Rights of members: Diversion of property: Trusts:
Exercise of power of appointment by trustee: Evidence: With-
drawal of one unit from religious denomination: Resolutions of
supreme body: Bill of exceptions: Certification as to evidence:
"All the evidence:" Judgments.*

1. When on appeal from an order sustaining a demurrer a decision
has been made by the supreme court it becomes the law of the
case, and must control any situation not materially variant
from that set forth by the complaint and then considered.
2. Neither seceding members, though a majority, nor any majority
of a religious society, no matter how fully invested with all cor-
porate powers, have a right to divert its property from the uses
defined and limited by the grant of such property to it or the
purposes of its organization as regards the particular religious
faith it was organized to promote.
3. A religious society holding property charged with a trust for cer-
tain purposes cannot, even by due corporate action, divert it to
other and inconsistent uses; and when such use is for the pro-
motion of the doctrine and discipline of some particular de-
nomination, courts will prevent diversion to the support of a
different and inconsistent one, if even a single individual le-
gally interested objects.
4. Where a deed of lands gave to trustees the right to appoint, not
an individual corporation or society, but some religious denom-
ination, to exercise ecclesiastical control over the premises,
viz., the occupation for religious services on Sundays and
Wednesday evenings, an appointment of a designated religious
denomination necessarily implies a limitation of such use to
the doctrines and purposes of that denomination.
5. Under a deed to trustees authorizing the appointment of some
religious society to exercise ecclesiastical possession over church
premises, the trustees made appointment to the Primitive Meth-
odist Society, which was a subordinate member of, and subject
to the discipline and regulations of, a conference, a synodical
religious organization. These regulations provided, among other
things, that all property was held subject to the uses of each
society when not inconsistent with the discipline and usages of
the Primitive Methodist Church, and should any society having

property cease to exist, or exist contrary to the usages and discipline of the Primitive Methodist Church, then its property should pass to the conference trustees to be held for the benefit of any organized Primitive Methodist society in the place where the real estate was situated, or, if impracticable, then to be held for the general purposes of the church and under the direction of the annual conference. *Held*, that the use of the property in question was restricted to a society subject to the discipline and supporting the doctrine of the Primitive Methodist denomination.

6. In such case, where the Primitive Methodist Society repudiated submission to the synodical head of the Primitive Methodist Church, and set itself up as the supreme authority over its own affairs and over its members in matters religious and secular, such action is *held* to be a departure from the use and purpose for which the possession of the property in question was originally conferred on the society and the use to which the property was limited.

7. To constitute one a member of a church, or an individual society a member of a general synodical organization, at least two things are essential: a profession of the accepted faith and a submission to its government.

8. Under a deed to trustees authorizing them to appoint some religious denomination to exercise ecclesiastical possession over the premises in question, the trustees appointed the Wesleyan Methodists to such use. In 1850 the Wesleyan Methodists withdrew from the occupation and ceased holding religious services upon the premises, and there was proof of some arrangement between them and the Primitive Methodist Society to occupy it, and that most of the original trustees were participants in the negotiations. It further appeared that immediately the Primitive Methodists entered into possession with apparent assent and approval of the trustees, and thence onward held religious services with the knowledge and active co-operation of several of the trustees. *Held*, in view of the remoteness of the transactions and the absence of any prescribed form by which the trustees were to make appointment, that the showing of long occupation, reputation, and apparent approval were sufficient, and, in the absence of anything in conflict, established a legal and proper appointment to the Primitive Methodist Society.

9. A resolution of the general conference of the Primitive Methodist Church: "If any church or circuit shall have decided to withdraw from the connection, we bid them God speed, and pray that their newer association may bring to them grander opportunities for the advancement of His Kingdom," is *held* not to have become a part of the discipline of the church, or open to

construction as a consent, approval, or authorization of any with-drawal whatever, but to have merely the significance of an ex-pression of resignation to a situation of inability to prevent such withdrawals, and lack of animosity towards those exercis-ing such right.

10. Under a deed to trustees with power to appoint some religious denomination to exercise the ecclesiastical possession over the granted premises and with power to make another appointment should the appointee "withdraw its services," a second appoint-ment vests in the appointee the right to the possession and use of the premises until it in turn withdraws its services.

11. Where a religious society was entitled to the use of certain church property until it withdrew its services, and, having been supplanted by another society, was strenuous in its efforts to regain possession for the purpose of conducting its services, failure to maintain religious services in the church is *held* not to be a withdrawal of such services.

12. A bill of exceptions recited, at the close of the evidence, that it contained "all the evidence material to the questions raised on the appeal," and in the certificate it was declared to contain "all the testimony given on both sides necessary to present the questions raised upon the appeal." *Held*, that the recitation at the close of the evidence, and necessarily certified to be true by the judge's signature, satisfied all requirements.

13. In the rule that, to enable this court on appeal to go behind either the findings or the verdict, there must be a certificate of the trial judge that the bill of exceptions contains all the evidence, the expression "all the evidence" means all *necessary* evidence.

14. Where a religious society, only entitled to a limited use and pos-session of a church edifice, recovers judgment establishing its right to possession, the judgment should only establish its right to such limited possession and use.

APPEAL from a judgment of the circuit court for Iowa county: E. RAY STEVENS, Judge. *Reversed.*

This is the same action in which the complaint was sus-tained upon demurrer in 117 Wis. 150, 93 N. W. 449. It has since been tried and findings filed presenting, as is claimed, widely variant facts from those stated in the com-plaint. The original deed, in trust, under which both parties claim, is the same set forth in the former case. The findings declare, however, that, instead of a secession of a majority of

the members of the old Dodgeville Methodist Society, there occurred an incorporation of that society into the Dodgeville Primitive Methodist Church, and then a vote by an overwhelming majority of the members of such corporation that the corporation itself sever its relations with the Primitive Methodist Church or Western Conference, of which the old society had been a member, and ally itself with the denomination of the Congregational Church, and thereafter merely a change of name of the corporation to the *Plymouth Congregational Church,* and that the defendant corporation is the same society as that which, prior to 1897, occupied the church property and of which the plaintiffs were members and officers. There is also a finding to the effect that the church building on the premises in question was burned in 1879, and rebuilt in 1880 by general subscription of citizens of Dodgeville and surrounding country, which were made, not with any understanding that the premises should be forever used as a place of worship by the said Dodgeville Primitive Methodist Society, but with the understanding that such edifice would be erected, controlled, and used agreeably to the terms contained in the original trust deed; also, "that a Congregational church is a separate, independent, self-governing religious body, owing no obedience or allegiance to any other church, synod, conference, council, or supervisory judicatory whatever; that each such Congregational church selects its own pastor, adopts its own creed and decides upon and establishes its own forms of worship;" and that since the incorporation of the defendant there has been no change of the creed, doctrines, or forms of worship used by such church when it called itself the Dodgeville Primitive Methodist Society. It appeared, substantially without dispute, that immediately after such incorporation, and upon affiliation with Congregational churches, which was done by formal public act, a considerable number of the members of the old Primitive Methodist Society withdrew from affiliation therewith,

and organized and attempted to maintain a society of the
Primitive Methodist denomination in affiliation with and sub-
ordination to the general synod or conference of that faith,
and have so continued up to the present time, and with con-
siderable persistency have been endeavoring to regain control
and possession of the premises now in controversy, meanwhile
holding meetings at stated intervals, first at the residence of
the several members, but later in the city hall.    The court
finds that the plaintiffs and those associated with them are at
present unable to furnish public religious services in the
church edifice, even if they are given possession of it.    So far
as other findings materially vary the situation, the substance
of them will appear in the opinion.    The trial court decided
that there had been no diversion of the property from its le-
gitimate uses, and rendered judgment dismissing the com-
plaint, from which plaintiffs appeal.

For the appellants there was a brief by *Spensley & Mc-
Ilhon, T. M. Priestly,* and *Carter & Mason,* and oral argu-
ment by *Vroman Mason* and *Calvert Spensley.*    They con-
tended, *inter alia,* that the right to occupy the church build-
ing, having come to the Primitive Methodist Society while
connected with that denomination as a subordinate branch,
and property having been acquired by that church while so
connected, the defendants lost all right to that possession and
use by severing connection with the denomination.    *Cape v.
Plymouth Cong. Church,* 117 Wis. 150; *Franke v. Mann,*
106 Wis. 118; *McBride v. Porter,* 17 Iowa, 203; *Mt. Helen
Baptist Church v. Jones,* 79 Miss. 488; *Bonacum v. Harring-
ton,* 65 Neb. 831, 91 N. W. 886; *Den ex dem. Am. P. Soc. v.
Pilling,* 24 N. J. Law, 653; *M. E. Church v. Wood,* 5 Ohio,
283; *McAuley's Appeal,* 77 Pa. St. 397; *Roshi's Appeal,* 69
Pa. St. 642, 8 Am. Rep. 275; *Schnorr's Appeal,* 67 Pa. St.
138, 5 Am. Rep. 415; *Jones v. Wadsworth,* 11 Phila. 227, 33
Leg. Int. 390; *Harmon v. Dreher,* Spears Eq. (S. C.) 87;
*Rodgers v. Burnett,* 108 Tenn. 173; *Kinkead v. McKee,* 9

Bush (Ky.) 535; *Sutter v. First Reformed Dutch Church,* 42 Pa. St. 503; *McGinnis v. Watson,* 41 Pa. St. 9; *Baptist Church v. Fort,* 93 Tex. 215; *Winebrenner v. Colder,* 43 Pa. St. 244; *Associate Ref. Church v. Trustees Theological Sem.* 4 N. J. Eq. 77; *Ferraria v. Vasconcelles,* 23 Ill. 456; *Lewis v. Watson,* 4 Bush, 228; *Bouldin v. Alexander,* 15 Wall. 131; *Schlichter v. Keiter,* 156 Pa. St. 119; *Den ex dem. Day v. Bolton,* 12 N. J. Law, 206.

For the respondents there were briefs by *Aldro Jenks* and *J. P. Smelker,* and oral argument by *Mr. Jenks.*

DODGE, J. Of course the former decision has become the law of this case, and must control any situation not materially variant from that set forth by the complaint and then considered. *Euting v. C. & N. W. R. Co.* 120 Wis. 651, 98 N. W. 944. The variation most strenuously urged is that, instead of secession by certain members from the society, the society itself made whatever change occurred by incorporating, changing its name, withdrawing from affiliation with and subordination to the Western Conference of the Primitive Methodist Church, and allying itself with the Congregational denomination, all by majority vote of its members in meeting duly assembled. Let this fact be conceded for the purposes of the argument, what is the result? The same authorities cited in the former opinion to deny the right of seceding members, though a majority, to take with them the property of the society also deny the power of the officers, or any majority of a religious corporation, no matter how fully invested with all corporate powers, to divert its property from the uses defined and limited "by the grant of such property to it or the purposes of its organization as regards the particular religious faith it was organized to promote." *Franke v. Mann,* 106 Wis. 118, 130, 81 N. W. 1014, 1018. A religious corporation holding property charged with a trust for certain purposes can no more divert it to other and inconsistent

uses, even by due corporate action, than can any other trustee. When such use is for the promotion of the doctrines and discipline of some particular denomination, courts will prevent diversion to the support of a different and inconsistent one, if even a single individual legally interested objects. *Fadness v. Braunborg,* 73 Wis. 257, 293, 41 N. W. 84; *Franke v. Mann, supra; Den ex dem. Day v. Bolton,* 12 N. J. Law, 206; *Watson v. Jones,* 13 Wall. 679; *First C. P. Church v. Congregational Soc.* 23 Iowa, 567. Under the rule above stated, doubtless the property which courts are to protect against diversion must be subject to some limitation upon its use. Whether limitation results from the mere denominational character of the religious corporation or society holding it is perhaps doubtful, but unnecessary of decision here, for other facts conclusively appear. If it be assumed that the Primitive Methodist Society held rights in this real estate as the appointee under the deed from Jabez Wilson, then they held them for denominational purposes, for the authority given by that deed to the trustees named therein was to appoint, not an individual corporation or society, but some religious denomination, to exercise what may be called the ecclesiastical possession over the premises, namely, the occupation for religious services on Sundays and on Wednesday evenings. Hence any appointment of the Primitive Methodists would necessarily imply a limitation of such use to the doctrines and purposes of that denomination. Further than this, however, the rights of the old Primitive Methodist Society were, up to the time of the incorporation, held by it as a subordinate member of the Western Primitive Methodist Conference, a synodical religious organization, and subject to its discipline and regulations. Among such we find sec. 233, to the effect that all property is held subject to the uses of each society "when not inconsistent with the discipline and usages of the Primitive Methodist Church;" and sec. 271, providing that should any so-

Cape v. Plymouth Congregational Church, 130 Wis. 174.

ciety having property cease to exist, or exist contrary to the usages and discipline of the Primitive Methodist Church, then its property should pass to the conference trustees to be held for the benefit of any organized Primitive Methodist society in the place where the real estate is situated; or, if this be impracticable, then to be held for the general purposes of the church and under the direction of the annual conference. These clearly restrict the use of the property in question to a society subject to the discipline and supporting the doctrine of the Primitive Methodist denomination.

The next question seriously controverted is whether any diversion from such restricted use has occurred. This is answered in the negative by respondents and, apparently, by the trial court, on the strength of the finding that no change in doctrine or forms of worship has been had. This, however, does not cover the whole question. To constitute one a member of a church, or an individual society a member of a general synodical organization, at least two things are essential: a profession of the accepted faith and a submission to its government. *Den ex dem. Day v. Bolton,* 12 N. J. Law, 206. The Primitive Methodist Church clearly belonged in the third classification of ecclesiastical bodies promulgated by MILLER, J., in *Watson v. Jones,* 13 Wall. 679, and adopted in *Franke v. Mann,* 106 Wis. 118, at page 133 (81 N. W. 1019), namely:

"Where the religious corporation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control, more or less complete, in some supreme judicatory, over the whole membership of that general organization."

The Primitive Methodist churches, in several of the Western states, were consolidated into what was called a general conference, known as the Western Conference, under the discipline of which there was primarily the society or congrega-

tion as a unit, having power to own property, and, by certain prescribed officers, to manage the ordinary daily affairs. Next in ascendency a few neighboring societies were organized into a circuit or charge, often, though perhaps not always, served by a single pastor or minister. The Dodgeville society, with three others, constituted a circuit. The discipline prescribed what was called the Quarterly Conference, which was made up of certain designated representatives from the several societies in the circuit, to wit, all the preachers, exhorters, class leaders, assistant leaders, stewards, Sabbath school superintendents, assistants and secretaries, Sabbath school treasurer, president of trustee board, and the presidents of all organizations connected with and under the control of the church. This conference had certain designated powers and authority over the various societies comprising its circuit. Then there was the supreme body known as the Annual Conference, composed of certain general officers, all ministers in full connection, and one lay delegate for each 100 members from each circuit or station within its limits. This conference was given the broadest powers of supervision, control, and judicatory in the government of all the societies and circuits composing it. The distinguishing feature of the churches of the Congregational denomination, on the other hand, is that each is a complete and independent republic and adopts its own laws, its own construction of the scriptural doctrine, its own church polity; and in none of these respects is it subject to any control by any other or more comprehensive organization. As is at once apparent, it might be a question of much nicety for a court to decide whether a Congregational society had so departed from the purposes of its organization as to constitute a breach of a trust to use its property for the purposes of Congregationalism, although cases are not lacking where courts have done so. *Mt. Zion B. Church v. Whitmore,* 83 Iowa, 138, 39 N. W. 81. But in the case of a society which is a member of a larger synodical

body the question is much easier of solution. It is beyond dispute that when the corporation known as the Dodgeville Primitive Methodist Church severed its membership in the Western Primitive Methodist Conference, declared itself a Congregational church, and made formal application for association with and recognition by other Congregational churches, it terminated its submission to the government of that general body known as the Primitive Methodist Church. It was no longer bound by or subject to the doctrines which should be promulgated, or the rules for protecting individual rights either of belief or against perversion of church property from uses which the conference might demand. A mere vote of the congregation might carry it far afield from the creed to which Primitive Methodists must subscribe and which it must promulgate if a member of the conference. Its members had no longer the assurance that the faith taught should have the sanction of the general body of Primitive Methodists in the West. Although it be true, as found by the court, that the corporation did persist in the doctrines which in 1897 received general approval by the conference, that fact of itself may mark a doctrinal severance from the Primitive Methodist Church, for the Annual Conference may have become convinced of some error in formerly entertained views, or may have had new occasion for construction and interpretation of the scriptural utterances upon which the faith of Christian churches generally is founded. But, as already suggested, whatever may be true of doctrine, the church polity and government was radically changed. No longer were the rights of the members guarded by the wisdom of the Annual Conference in the selection of their pastor, in the management of the property of the church, or in the multitudinous other respects in which the individual member may suffer at the hands of the majority. We cannot avoid the conclusion that the repudiation, even by the society or corporation, of submission to the Annual Conference and setting itself up

as the supreme authority over its own affairs and over its members in matters religious and secular, was a departure from the use and purpose for which the partial possession in this property was originally conferred on the society and to which use such property was limited, and, therefore, that it exceeded the right or power over that property had by either the corporation or its governing officers.

In the view adopted by the trial court that the defendant corporation is the same society existing prior to 1897 under the name of the Dodgeville Primitive Methodist Church, and which,. for some fifty years, had been in possession of these premises, of course the defendants could have no greater right than had the former society, and the sole question for decision is whether their procedure was such as to continue those rights of possession or partial possession. This renders it rather unimportant whether there ever was complete nomination and appointment of the Primitive Methodist denomination in lieu of the Wesleyan Methodists in compliance with the trust deed from Wilson, for the old society at least had and exercised possession, and defendants were as much restrained and limited in an attempt to pervert that possession as if the title were absolute. We have, however, examined the evidence upon the question of appointment, and are persuaded that it suffices to establish the fact of actual appointment by the original trustees. It is proved that about 1849 or 1850 the Wesleyan Methodists did withdraw from the occupation of and holding religious services upon these premises, and that some arrangement was made between them and the Primitive Methodist Society to occupy it, whereby the latter refunded some money which the Wesleyans had paid toward the cost of the original church edifice; also that most, if not all, of the trustees under the Wilson deed were participant in such negotiations; that immediately the Primitive Methodists entered into possession with the apparent assent and approval of such trustees, and from 1850 onward held

their religious services on Sundays and Wednesday evenings there, with the knowledge and active co-operation of several of such trustees. In view of the remoteness of these transactions and of the absence of any prescribed form by which the trustees under the deed were to make appointment of the denomination to supply such religious services, we are persuaded that this showing of long occupation, reputation, and apparent approval are sufficient, in the absence of anything in conflict, to establish a legal and proper appointment. 1 Jones, Ev. § 72 et seq.; 22 Am. & Eng. Ency. of Law (2d ed.) 1289; 2 Wigmore, Ev. § 1583; *Rooker v. Perkins,* 14 Wis. 79; *Nelson v. Jacobs,* 99 Wis. 547, 559, 75 N. W. 406.

Much stress was laid in argument upon a resolution adopted by the general conference of the Primitive Methodist Church in May, 1896, to the effect that "if any church or circuit shall have decided to withdraw from the connection, we bid them God speed, and pray that their newer association may bring to them grander opportunities for the advancement of His Kingdom." This was contended by the respondents to become, so to say, a part of the discipline, and to make it the right of any congregation to withdraw. We deem this resolution immaterial to the present controversy. In the first place, if an authorization, as claimed, it was addressed only to the circuit or charge, which could act only in quarterly conference, as hereinbefore described, and had no application to secession by an individual society without action of the conference. Apart from this, however, we can find nothing in the resolution significant of an intent to waive the provisions in the discipline above referred to, providing for the retention of the property of any society which should secede, for the benefit of any Primitive Methodist Society at that place. But we do not think that the resolution is open to construction as a consent, approval, or authorization of any withdrawal whatever. It bears upon its face, especially in the light of the surrounding facts, merely the significance of

an expression of resignation to a situation of inability to prevent such withdrawals and lack of animosity toward those who should exercise such right. There is a claim, not, however, strongly urged on the part of the defendants, to the effect that, having obtained in March, 1897, from the survivors of the original trustees named in the Wilson deed a quitclaim deed of the premises in question, they have the rights of an appointee under that trust. The deed itself is in the simplest form of a quitclaim deed, and contains no intimation of any purpose to exercise the power of appointment vested in the trustees. But whether, under any circumstances, it may be so construed, we find it unnecessary to decide, for we deem it plain that, under the terms of the trust, there was no power vested in the trustees to revoke an appointment once made. The original dominant occupant was to be the Wesleyan Methodists denomination, and the power of appointment did not arise until that denomination "shall withdraw its services." The authority then was to appoint another denomination to enjoy and serve the same purposes. We think it plain that, such an appointment being made, such denomination became vested with the right until it in turn should withdraw its services. We cannot at all agree with the suggestion of respondents' counsel that the failure of the Primitive Methodist Society existing at Dodgeville since 1897 to maintain religious services in this church since that time is at all tantamount to a withdrawal. They have been most strenuous, energetic, and persistent at all times in demanding an opportunity so to do, and, while the society may have been small and struggling during that period, it requires but common knowledge to understand that its very inability to gain possession of this place of worship has been a cogent influence toward that situation. We cannot find evidence to support the somewhat prophetic finding that plaintiffs and their associates are unable to furnish public religious services if they were given possession of the church premises. They

are recognized by the Annual Conference as an established society; they do maintain regular services, even deprived of a desirable meeting place; their number now is somewhere from fourteen to fifty, with no suggestion of inability to supply pecuniary needs. Besides, were they in occupation of these premises, their number would, beyond doubt, be augmented by many of the defendants' present congregation, who, not ardent in support of either faction, follow the *de facto* authorities.

It is urged that we cannot review the findings for the reason that it is not sufficiently certified that the bill of exceptions contains all the evidence. That document contains a recitation to the effect that therein is "all the evidence material to the questions raised on the appeal," and in the certificate it is declared to contain "all the testimony given on both sides necessary to present the questions raised upon the appeal." Doubtless there are many expressions in our decisions declaring the necessity generally that there shall be a certificate by the trial judge that the bill of exceptions contains all the evidence, to enable this court on appeal to go behind either findings or verdict. The expression "all the evidence" is, however, used in those cases in the sense of all necessary evidence. It would, of course, be absurd to require that all the evidence received upon a protracted trial with many issues must be before this court to enable it to examine the correctness of a finding by a court or jury upon a single one of those issues. In this view the rule of court on the subject (Circuit Court Rule XXII, sec. 3) provides that the bill of exceptions shall contain only so much of the evidence as may be necessary to present the questions of law raised on the trial, and requires of the trial judge that he strike out redundancy. Further than this, it has been declared by this court sufficient that the bill contain all the evidence material to the questions raised upon the appeal. *Reinke v. Wright,* 93 Wis. 368, 370, 67 N. W. 737. In the

light of such reason and decision we cannot doubt that the recitation inserted at the close of the evidence, and necessarily certified to be true by the judge's signature, satisfies all requirements, although the certificate itself, merely to the effect that all the *testimony* is contained therein, might not suffice. *Goodhue v. Bohen,* 122 Wis. 241, 245, 99 N. W. 216.

Perhaps a precautionary word is necessary to emphasize the fact that the rights here considered, whether they belong to plaintiffs or defendants, are very limited in their character, and are only those prescribed by the Wilson deed for what we may term a dominant religious sect, namely, to use the church only at specified times, subject to the command that otherwise it shall be open to ministers of other denominations and for other purposes of moral tendency. In this view the plaintiffs, though entitled to judgment against the defendants, are entitled to be protected in only such rights as the trustees in the Wilson deed could confer. They should have judgment establishing the right of the plaintiff society to have the use of the church edifice from 10:30 to 12:30 o'clock Sunday mornings and at 6 o'clock Sunday evenings and on every Wednesday evening, and that defendants be enjoined from in any wise interfering with such use.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment in accordance with the prayer of the complaint, except as qualified in the foregoing opinion.