# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2021AP265-CQ |

| | |
|---|---|
| COMPLETE TITLE: | St. Augustine School, Joseph Forro and Amy Forro, |
| | Plaintiffs-Appellants, |
| | v. |
| | Carolyn Stanford Taylor, in her official capacity as Superintendent of Public Instruction, Tony Evers, in his official capacity as Superintendent of Public Education, terminated 2/14/20 and Friess Lake School District, |
| | Defendants-Appellees. |

CERTIFIED QUESTION FROM THE UNITED STATES COURT
OF APPEALS FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| OPINION FILED: | July 2, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | May 4, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | |
| COUNTY: | |
| JUDGE: | |

JUSTICES:
ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which DALLET, HAGEDORN, and KAROFSKY, JJ., joined. ROGGENSACK, J., filed a concurring opinion. HAGEDORN, J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the plaintiffs-appellants, there were briefs filed by *Richard M. Esenberg, Brian McGrath, Anthony LoCoco,* and *Wisconsin Institute for law & Liberty*, Milwaukee. There was an oral argument by *Richard M. Esenberg*.

For the defendants-appellees Friess Lake School District, there was a brief filed by *Lori M. Lubinsky*, *Danielle B. Tierney* and *Axley Brynelson, LLP,* Madison.

For the defendant-appellee Superintendent Carolyn Stanford Taylor, there was a brief filed by *Hannah S. Jurss*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Hanna S. Jurss*.

No. 2021AP265-CQ

STATE OF WISCONSIN          :          IN SUPREME COURT

St. Augustine School, Joseph Forro and Amy
Forro,

      Plaintiffs-Appellants,

  v.

Carolyn Stanford Taylor in her official
capacity as Superintendent of Public
Instruction and Friess Lake School District,

      Defendants-Appellees.

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

FILED

JUL 2, 2021

Sheila T. Reiff
Clerk of Supreme Court

---

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which DALLET, HAGEDORN, and KAROFSKY, JJ., joined. ROGGENSACK, J., filed a concurring opinion. HAGEDORN, J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., joined.

---

CERTIFICATION of question of law from the United States Court of Appeals for the Seventh Circuit. *Certified question answered and cause remanded.*

¶1 ANN WALSH BRADLEY, J. This case is before the court on a certified question from the United States Court of Appeals

for the Seventh Circuit.  See Wis. Stat. § 821.01 (2019-20).[1] Explaining that the question boils down to one of methodology, it certified the following question:

> For purposes of determining whether two or more schools are "private schools affiliated with the same religious denomination" for purposes of Wis. Stat. [§] 121.51, must the state superintendent rely exclusively on neutral criteria such as ownership, control, and articles of incorporation, or may the superintendent also take into account the school's self-identification in sources such as its website or filings with the state.

¶2    This question arises in the context of St. Augustine School's (St. Augustine) application for transportation benefits pursuant to Wis. Stat. §§ 121.51 and 121.54.  Pursuant to these statutes, private schools are entitled to receive public funding to transport children to their schools, but only one affiliated school per "religious denomination" can receive the funding in each "attendance area."

¶3  St. Augustine's application was denied by the Superintendent of Public Instruction on the ground that another school of the same religious denomination within the same attendance area was already receiving the benefit. Specifically, the Superintendent determined that St. Gabriel, a Catholic school affiliated with the Archdiocese of Milwaukee, was already established in the same attendance area as St.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

Augustine, and St. Augustine also represented itself as a Roman Catholic school.

¶4 The certified question asks us only what information the Superintendent may consider in making a determination regarding whether two schools are "affiliated with the same religious denomination." It does not ask us to resolve whether St. Gabriel and St. Augustine are actually of the same religious denomination. The application of the facts to the law remains with the federal courts upon remand.

¶5 We conclude that, in determining whether schools are "affiliated with the same religious denomination" pursuant to Wis. Stat. § 121.51, the Superintendent is not limited to consideration of a school's corporate documents exclusively. In conducting a neutral and secular inquiry, the Superintendent may also consider the professions of the school with regard to the school's self-identification and affiliation, but the Superintendent may not conduct any investigation or surveillance with respect to the school's religious beliefs, practices, or teachings.

¶6 Accordingly, we answer the certified question and remand to the United States Court of Appeals for the Seventh Circuit for further proceedings.

I

¶7 St. Augustine is a private, religious school located within the boundaries of the Friess Lake School District (the School District). On its website, St. Augustine describes

itself as "an independent and private traditional Roman Catholic School."

¶8 Plaintiffs Joseph and Amy Forro are parents whose children attend St. Augustine. Seeking transportation for their children to and from school, the Forros along with St. Augustine made a request for a busing contract from the School District pursuant to Wis. Stat. § 121.54.[2]

¶9 In the request, St. Augustine asserted that it is unaffiliated with the Archdiocese of Milwaukee. It stated: "Our governing body is our Board of Directors and we receive no funding from nor communicate with the Diocese on matters of education." As such, St. Augustine distinguished itself from St. Gabriel Catholic School, a diocesan Catholic school also located within the boundaries of the School District.

---

[2] Wisconsin Stat. § 121.54 provides in relevant part:

> Except as provided in sub. (1) or otherwise provided in this subsection, the school board of each district operating high school grades shall provide transportation to and from the school a pupil attends for each pupil residing in the school district who attends any elementary grade, including kindergarten, or high school grade at a private school located 2 miles or more from the pupil's residence, if such private school is a school within whose attendance area the pupil resides and is situated within the school district or not more than 5 miles beyond the boundaries of the school district measured along the usually traveled route.

§ 121.54(2)(b)1.

4

¶10  The School District denied St. Augustine's request. In doing so, it noted that the Forros' address "is within the boundaries already approved for a Catholic School."  Because the School District already bused students to St. Gabriel, it determined that it could not approve St. Augustine's request as it would constitute an overlapping attendance area.

¶11  With St. Augustine and the School District at odds, they sought a determination from the Superintendent.[3]  As it did before the School District, St. Augustine argued that it is not affiliated with the same religious denomination as St. Gabriel within the meaning of Wis. Stat. § 121.51(1).  In support of this argument, it asserted:

> Neither St. Augustine School, Inc., nor the school operated by the corporation, has ever been affiliated by control, membership, or funding with the Archdiocese of Milwaukee.  No representative of the Archdiocese or a parish church of the Archdiocese has ever been a director or officer of St. Augustine School, Inc.  No employees of St. Augustine School have ever been hired or compensated by the Archdiocese or a parish church of the Archdiocese.  None of the religious instructors at St. Augustine School have

---

[3] Wisconsin Stat. § 121.51 outlines a procedure by which a private school's attendance area is proposed by the private school's governing body and then considered by the public school district's school board. Providence Cath. Sch. v. Bristol Sch. Dist. No. 1, 231 Wis. 2d 159, 176, 605 N.W.2d 238 (Ct. App. 1999).  The statute further provides that in the event of a disagreement between the private and public school, the determination will be made by the Superintendent.  Id.; § 121.51(1) ("If the private school and the school board cannot agree on the attendance area, the state superintendent shall, upon the request of the private school and the board, make a final determination of the attendance area.").

ever been employed, assigned, or compensated for their work at St. Augustine School by the Archdiocese or a parish church of the Archdiocese.

¶12 Then-Superintendent Tony Evers[4] agreed with the School District and denied St. Augustine's request for the transportation benefit. He concluded that "St. Augustine School, Inc. is a private, religious school affiliated with the Roman Catholic denomination." Further, he determined that "[t]he District already provides transportation to students attending St. Gabriel School, another private, religious school affiliated with the Roman Catholic denomination, the attendance area of which is co-extensive with the attendance area of the District." As a result, the Superintendent concluded that St. Augustine's attendance area overlaps that of St. Gabriel and thus "the Friess Lake School District is not required to provide transportation to students attending St. Augustine School, Inc."

¶13 The Superintendent's written decision reflects that he examined all of the parties' filings, St. Augustine's website, and the law in reaching his decision. He commented specifically on the school's bylaws and determined that nothing in that document "even hints that the School is a private religious school or a private, religious non-denominational school." The Superintendent also made specific comments on an amendment to St. Augustine's articles of incorporation changing its name from

---

[4] Then-Superintendent Evers has since been elected Governor, and has been replaced as a party to this case by the current Superintendent, Carolyn Stanford Taylor.

6

Neosho Country Christian School Inc. to its current moniker. As with the bylaws, the Superintendent concluded that "there is nothing in the School's name change amendment to its Articles of Incorporation that reveals anything about the School's nature, i.e., religious or non-religious, or its affiliation with a religious denomination."[5]

¶14 Finding these sources unhelpful in determining St. Augustine's "affiliation with a religious denomination" for purposes of Wis. Stat. § 121.51, the Superintendent looked to St. Augustine's publicly available website. Such a procedure was permissible, in the Superintendent's view, because "[r]eviewing a public website that is created and maintained by or on behalf of the School, and accepting the School's description of itself as set forth in that website, does not create an excessive entanglement of state authority in religious affairs." The Superintendent supported such a determination with the premise that "a public website, by its very nature, invites, and even wants persons to review it."

---

[5] In previous proceedings, disputes arose as to whether St. Augustine submitted the original articles of incorporation to either the School District or the Superintendent and whether the Superintendent actually considered St. Augustine's original articles of incorporation. The Seventh Circuit determined that "plaintiffs have failed to carry their burden of producing evidence to support their assertion that the defendants looked at the document. Without any evidence that they did so, a secondary dispute over whether St. Augustine submitted the original articles of incorporation to the state is immaterial." St. Augustine Sch. v. Evers (St. Augustine II), 906 F.3d 591, 595-96 (7th Cir. 2018) (citation omitted).

7

¶15 Relying on statements on St. Augustine's website, the Superintendent agreed with the School District that St. Augustine is affiliated with the Roman Catholic denomination. He cited in his decision "two of a number of statements in the website pages from which any reasonable person would conclude the School is a religious school affiliated with the Roman Catholic denomination." The first of these statements sets forth that St. Augustine is "an independent and private traditional Roman Catholic School . . . [that is] an incorporation of dedicated families, who believing that all good things are of God, have joined together to provide the children of our Catholic community with an exceptional classical education." Additionally, the website provides: "[St. Augustine] loves and praises all the traditional practices of the Catholic faith."

¶16 St. Augustine responded to the adverse determination by filing suit in Washington County circuit court against the Superintendent and the School District, asserting a claim pursuant to 42 U.S.C. § 1983 that its rights under Free Exercise and Establishment Clauses of the First Amendment were violated, as well as a claim that the Superintendent and School District contravened Wis. Stat. § 121.51(1). The Superintendent and School District removed the case to federal court.

¶17 After the parties filed competing summary judgment motions, the District Court granted the Superintendent and the School District's motion with respect to the federal claims. St. Augustine Sch. v. Evers (St. Augustine I), 276 F. Supp. 3d

8

890 (E.D. Wis. 2017). As relevant to the certified question, the District Court determined that the Superintendent and the School District did not engage in an excessive entanglement with religion in reaching their conclusion that St. Augustine is affiliated with the Catholic denomination. Id. at 902. It concluded that "because St. Augustine was obviously a religious school and did not submit any articles of incorporation or bylaws that identified or disclaimed its affiliation with a religious denomination," the Superintendent permissibly looked elsewhere to surmise what St. Augustine purported to be. Id.

> The defendants then turned to the statement on St. Augustine's website describing it as a "Roman Catholic School," and they accepted this statement at face value and concluded that St. Augustine was affiliated with the Roman Catholic denomination. These actions did not involve any participation in, supervision of, or intrusive inquiry into religious affairs.

Id.

¶18 St. Augustine appealed, and the Seventh Circuit affirmed the District Court's decision over Judge Ripple's dissent. St. Augustine Sch. v. Evers (St. Augustine II), 906 F.3d 591 (7th Cir. 2018). The Seventh Circuit majority saw no free exercise problem with the Superintendent and School District's application of Wis. Stat. § 121.51, determining that "[t]he reason why St. Augustine cannot demand services within its desired attendance zone is not because it is a Catholic school; it is because—by its own choice—it professes to be affiliated with a group that already has a school in that zone."

9

Id. at 597. "The problem for St. Augustine is not that it is Catholic; it is that it is second in line." Id.

¶19 The Seventh Circuit further determined that there was no entanglement problem. "[T]he school district and state superintendent did not consider St. Augustine's theology or its religious practices." Id. at 598. Instead, in the Seventh Circuit's view, "[t]aking a party's repeated chosen label at face value hardly constitutes a deep-dive into the nuances of religious affiliation." Id. at 599.

¶20 In contrast, Judge Ripple dissented, concluding that the Superintendent failed to follow precedent when he went beyond St. Augustine's articles of incorporation and bylaws to make the determination at issue. Id. at 603 (Ripple, J., dissenting). In Judge Ripple's view, "[r]ather than grounding his decision in the articles of incorporation and by-laws as he was required to do under state law, [the Superintendent] decided to undertake an independent investigation and rested his decision on statements he found on St. Augustine's website." Id.

¶21 Judge Ripple further criticized the majority's approach for taking the term "Catholic" out of context. Id. at 604. He cautioned: "the court's selective use of the term 'Catholic' rests on the assumption that, for purposes of our Free Exercise analysis, a single term, even when culled from its context, can describe accurately the religious values and aspirations of an individual or a group of individuals." Id.

10

¶22 St. Augustine petitioned for certiorari with the United States Supreme Court. The Court granted certiorari but did not issue a full opinion. Instead, it simply vacated the judgment and remanded to the Seventh Circuit for consideration in light of its recent decision in Espinoza v. Montana Department of Revenue, 591 U.S. __, 140 S. Ct. 2246 (2020).[6] St. Augustine Sch. v. Taylor (St. Augustine III), 141 S. Ct. 186 (2020). After remand, the Seventh Circuit certified to this court the question now before us.

## II

¶23 The certified question asks us to interpret Wis. Stat. § 121.51. Statutory interpretation is a question of law we review independently. Winebow, Inc. v. Capitol-Husting Co., Inc., 2018 WI 60, ¶23, 381 Wis. 2d 732, 914 N.W.2d 631. We are not bound by the interpretations of the federal courts, but they may aid in our analysis. See id. (citation omitted).

¶24 Our review of the statute is informed by the Constitution and precedent. The application of constitutional

---

[6] In Espinoza, the Court addressed a Montana program that provides tuition assistance to parents who send their children to private schools. Espinoza v. Mont. Dep't of Revenue, 591 U.S. __, 140 S. Ct. 2246, 2251 (2020). When the petitioners sought to use the program for scholarships at religious schools, the Montana supreme court struck down the program on the basis of a "no-aid" provision in the Montana Constitution, which prohibits any aid to a school controlled by a "church, sect, or denomination." Id. The Court determined that the no-aid provision violates the Free Exercise clause, writing that "[a] State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." Id. at 2261.

11

principles likewise presents a question of law. State v. Roundtree, 2021 WI 1, ¶12, 395 Wis. 2d 94, 952 N.W.2d 765.

III

¶25 We begin by setting the foundation for our analysis, detailing the history of this court's interpretation of Wis. Stat. § 121.51. With that necessary history and context in hand, we then turn to examine the certified question.

A

¶26 In 1967, the people of Wisconsin adopted a constitutional provision setting forth: "Nothing in this constitution shall prohibit the legislature from providing for the safety and welfare of children by providing for the transportation of children to and from any parochial or private school or institution of learning." Wis. Const. art. I, § 23. Several provisions in ch. 121 of the Wisconsin Statutes operationalize this guarantee.

¶27 Wisconsin Stat. § 121.54(2)(b) sets forth the conditions under which a student attending a private school can receive publicly funded transportation. It provides:

> Except as provided in sub. (1) or otherwise provided in this subsection, the school board of each district operating high school grades shall provide transportation to and from the school a pupil attends for each pupil residing in the school district who attends any elementary grade, including kindergarten, or high school grade at a private school located 2 miles or more from the pupil's residence, if such private school is a school within whose attendance area the pupil resides and is situated within the school district or not more than 5 miles beyond the boundaries of the school district measured along the usually traveled route.

12

§ 121.54(2)(b)1.

¶28 "Attendance area" is a defined term that sits at the center of the instant case. Wisconsin Stat. § 121.51(1) defines "attendance area" as follows:

[T]he geographic area designated by the governing body of a private school as the area from which its pupils attend and approved by the school board of the district in which the private school is located. If the private school and the school board cannot agree on the attendance area, the state superintendent shall, upon the request of the private school and the board, make a final determination of the attendance area. The attendance areas of private schools affiliated with the same religious denomination shall not overlap unless one school limits its enrollment to pupils of the same sex and the other school limits its enrollment to pupils of the opposite sex or admits pupils of both sexes.

¶29 The natural question that arises from the definition of "attendance area" is what it means for private schools to be "affiliated with the same religious denomination." After all, assuming that schools are co-educational and not single-sex, only one school of each "religious denomination" may receive the transportation benefit in a single attendance area.

¶30 This court first addressed this language in 1971 in State ex rel. Vanko v. Kahl, 52 Wis. 2d 206, 188 N.W.2d 460 (1971). In Vanko, the court addressed a constitutional challenge to the attendance area statute.

¶31 The court acknowledged that there would be a constitutional problem if the statute were interpreted to include "a restriction placed upon children attending religious schools and not placed upon those attending private, secular

13

schools." Id. at 214. This problem would arise because "[r]eligious affiliation would be the sole basis of the classification." Id. Accordingly, the court engaged in a saving construction to avoid the constitutional infirmity, interpreting the statute to apply to both religious and non-religious schools: "We read the statute as not authorizing or permitting overlapping in attendance area boundary lines as to all private schools affiliated or operated by a single sponsoring group, whether such school operating agency or corporation is secular or religious." Id. at 215.

¶32 Building on its decision in Vanko, the court seven years later decided Holy Trinity Community School, Inc. v. Kahl, 82 Wis. 2d 139, 262 N.W.2d 210 (1978). In Holy Trinity, the plaintiff school was previously a Catholic school affiliated with the Archdiocese. It responded to the Vanko decision by reorganizing as a "community school" with no legal ties to the Roman Catholic Church or any other religious organization. Id. at 146. However, the new community school took over all the employment contracts of the old Catholic school, accepted all students who attended the school's previous iteration, and utilized the same building as the old Catholic school, owned by the Holy Trinity Congregation, which leased the building to the community school for one dollar annually. Id.

¶33 The community school no longer required Catholic instruction, but instead instituted a release time for religious programming of the students' parents' choice. Id. at 146-47. However, in practice only the Catholic religion was taught

14

during the release time. Id. at 147. Based on these facts, the Superintendent found that Holy Trinity Community School was affiliated with the Catholic denomination, even though it was not controlled by the Archdiocese or the Roman Catholic Church. Id.

¶34 Pinpointing a constitutional infirmity in the manner the Superintendent went about making his determination, the Holy Trinity court concluded:

> [W]here a religious school demonstrates by a corporate charter and bylaws that it is independent of, and unaffiliated with, a religious denomination, that in the absence of fraud or collusion the inquiry stops there. To make the further inquiry, as attempted by the Superintendent of Public Instruction, is to involve the state in religious affairs and to make it the adjudicator of faith.

Id. at 157-58.

¶35 The court explained that the "continuing surveillance of [the] school to determine whether its practices comport with those of the Catholic Church" causes an excessive entanglement of the government in purely religious matters. Id. at 150. It is not for the government to decide "who or what is Catholic," and accordingly the inquiry undertaken by the Superintendent in Holy Trinity was deemed unconstitutional. Id. The court continued, discussing the sources of information at play under the facts of Holy Trinity:

> For this court or for the Superintendent of Public Instruction to determine, in the light of the prima facie showing of the articles of incorporation to the contrary, that this school corporation is or is not affiliated with the Catholic denomination is to meddle into what is forbidden by the Constitution the

15

determination of matters of faith and religious allegiance.

Id. Thus, it concluded that "[w]e are obliged to accept the professions of the school and to accord them validity without further inquiry." Id. at 155.

¶36 At the time we granted the certification in this case, we asked the parties to address a question in addition to that certified by the Seventh Circuit:

> The Free Exercise Clause and the Establishment Clause of the First Amendment may bear upon our interpretation of Wis. Stat. § 121.51 and its inclusion of "private schools affiliated with the same religious denomination." In meeting the query of the certified question, should we revisit this court's decisions in State ex rel. Vanko v. Kahl, 52 Wis. 2d 206, 188 N.W.2d 210 (1971) and Holy Trinity Community School, Inc. v. Kahl, 82 Wis. 2d 139, 262 N.W.2d 210 (1978) . . . .

¶37 In briefing, no party asked us to overrule either Vanko or Holy Trinity, and in fact St. Augustine, the Superintendent, and the School District all affirmatively stated that we need not and should not overrule or revisit the holdings of those cases. When pressed at oral argument, the discussion focused on Vanko, and both parties reiterated their positions that we not upset that case.[7] Accordingly, we decline to

---

[7] At oral argument, St. Augustine's counsel stated: "Here today, no one is asking this court to overrule Vanko." See State ex rel. Vanko v. Kahl, 52 Wis. 2d 206, 188 N.W.2d 460 (1971). Later, the same counsel suggested that Vanko's status of remaining unchallenged for over 50 years is some indication that its statutory interpretation has been workable and relied upon for decades:

(continued)

overrule or revisit either case on our own initiative. See
Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶24, 393
Wis. 2d 38, 946 N.W.2d 35 (explaining that "[w]e do not step out
of our neutral role to develop or construct arguments for
parties; it is up to them to make their case").

B

¶38 With this foundation in hand, we turn now to address
the certified question.

¶39 The Seventh Circuit's certification order puts a fine
point on the issue before us and assists in focusing on the
distinct and narrow question. After summarizing the lengthy
history of this litigation, the Seventh Circuit relates that
"[a]t this juncture . . . the issue has boiled down to one
dispositive question of state law: what methodology for
determining affiliation is required under the relevant Wisconsin
statutes?" St. Augustine Sch. v. Taylor (St. Augustine IV), No.
17-2333 (7th Cir. Feb. 16, 2021) (order certifying question to
Wisconsin Supreme Court) at 2.

---

> [This court] could certainly come to the conclusion
> that Vanko is a 50-year-old decision and the fact that
> we haven't been before the court for 50 years and are
> here only because the [Superintendent] did something
> so extraordinary that it resulted in a grant of cert
> and a [vacating of the Seventh Circuit's decision] is
> some indication that [the statute] is workable given
> the reliance that schools and families have had on the
> statutory interpretation that sticking to precedent
> might be the best thing to do.

Counsel for the Superintendent similarly argued that "the
court got it right in Vanko."

17

¶40  Prior to proceeding with our analysis, we offer an observation regarding what is before us and what is not.  The Seventh Circuit has certified to us a pure question of law pertaining only to the sources of information the Superintendent may consider in determining whether two schools are "affiliated with the same religious denomination" for purposes of Wis. Stat. § 121.51(1).  In essence, it is an inquiry of methodology.

¶41  We do not apply our determination to the facts of this case.  That is, we do not determine whether St. Augustine is affiliated with the same religious denomination as St. Gabriel.  That is a question for the federal court on remand.  With this clarification, we proceed to our analysis.

¶42  Both the Constitution and our precedent interpreting the statute provide relevant guardrails around the world of information a Superintendent may consider.  The Constitution prohibits the excessive entanglement of the state in religious matters.  L.L.N.  v.  Clauder, 209  Wis. 2d 674,  686,  563 N.W.2d 434  (1997).  Such  a  proposition,  known  as  the entanglement doctrine, springs from the Establishment Clause of the First Amendment.[8]  Id.

¶43  Excessive entanglement occurs "if a court is required to interpret church law, policies, or practices."  Id. at 687.

---

[8] The Establishment Clause of the First Amendment provides: "Congress  shall  make  no  law  respecting  an  establishment  of religion . . . ."  U.S. Const. amend. I.  It is applicable to the states through the Fourteenth Amendment.  L.L.N. v. Clauder, 209 Wis. 2d 674, 686, 563 N.W.2d 434 (1997).

Thus, the First Amendment prohibits such an inquiry. Id. On the other hand, it is well-settled that "a court may hear an action if it will involve the consideration of neutral principles of law." Id. (citations omitted).

¶44 The certified question requires us to determine whether the consideration of certain matters in the determination of whether two schools are "affiliated with the same religious denomination" would rely on an unconstitutional religious inquiry and thus cause an impermissible excessive entanglement, or whether such consideration would merely involve the application of neutral principles of law. We are asked to address specifically a school's self-identification as set forth on its publicly available website or in its filings with the state.

¶45 St. Augustine argues that the manner in which the Superintendent considered such information impermissibly places the Superintendent in the position to decide "what is Catholic" and thus constitutes an excessive entanglement with religion. In contrast, the Superintendent and the School District advance that simply accepting St. Augustine's self-identification does not require any investigation at all or any determination of whether St. Augustine is Catholic——they are simply taking St. Augustine at its word.

¶46 Because we refrain from developing arguments not advanced by either party and determine that our precedent should be maintained rather than overruled, our inquiry is framed by Vanko and Holy Trinity. Vanko established that "affiliated with

19

the same religious denomination" is "the test of affiliation in a single school system rather than operation by a single agency or set of trustees or religious order within a particular religious denomination." Vanko, 52 Wis. 2d at 215. It further establishes that the statute applies to both religious and secular schools "affiliated or operated by a single sponsoring group." Id.

¶47 Holy Trinity is particularly apt in guiding our approach to the certified question. There, the court engaged in a similar exercise of line-drawing to that which we undertake in the instant case. The line the Holy Trinity court drew between the constitutional and the unconstitutional was at the investigation and surveillance of a school's religious practices. Holy Trinity, 82 Wis. 2d at 150. With regard to statements made by a school, the court set forth: "We are obliged to accept the professions of the school and to accord them validity without further inquiry." Id. at 155.

¶48 Just as in Holy Trinity, accepting a school's professions that are published on its public website or set forth in filings with the state does not necessarily require any investigation or surveillance into the practices of the school. It need not require any religious inquiry at all.

¶49 As long as the Superintendent considers the school's professions and not its practices, the Superintendent remains on the correct side of the line. In other words, a superintendent attempting to determine that a school is affiliated with a specific religious denomination may rely on any evidence of

20

affiliation between the school and a denomination that does not violate the First Amendment and that does not inquire into the religious beliefs of the school or the denomination.

¶50 The wording of the certified question implies that corporate documents represent neutral criteria while a school's self-identification in sources such as its website and filings with the state does not. But this appears to be a false dichotomy. Indeed, simply accepting a school's profession of what it claims to be or with whom it is affiliated constitutes a neutral undertaking, as does the acceptance of a school's professions of affiliation in documents filed with the state. Here St. Augustine professes that while it is Roman Catholic, it is independent of and unaffiliated with the Archdiocese. Neither accepting corporate documents nor accepting a school's professions necessarily requires any investigation of the type prohibited by Holy Trinity or even any religious inquiry whatsoever.

¶51 Our conclusion is further supported with a look to a related statute. Wisconsin Stat. § 187.01(7) addresses amendments to the articles of incorporation of a religious society. It provides in relevant part:

> Such corporation may amend its articles of organization or constitution at a regular meeting of said corporation by the majority vote of the members present so that such corporation has the right to merge with and transfer all of its real estate and personal property to another corporation of the same religious denomination.

§ 187.01(7) (emphasis added).

21

¶52 An important principle can be gleaned from this statutory text. The phrasing "another corporation of the same religious denomination" indicates that "religious denomination" is a broader category than "corporation." In other words, there can be multiple corporations that fit under the umbrella of a single religious denomination. If the legislature wanted to limit the Superintendent's consideration to corporate documents in an inquiry of whether the schools are affiliated with the same corporate body, it would not have used the broader term "religious denomination" in Wis. Stat. § 121.51(1). Indeed, a single corporate charter may not fully answer whether a school is affiliated with a religious denomination.

¶53 Vanko also supports such a premise. To explain, Vanko highlighted that "affiliated with the same religious denomination" is the test to be used within a school system "rather than operation by a single agency or set of trustees or religious order within a particular religious denomination." Vanko, 52 Wis. 2d at 215 (emphasis added). Thus, Vanko explicitly disclaimed an assertion that "operation by a single agency" is a necessary condition to establish that two schools are of the same religious denomination. To limit the inquiry to exclusively corporate documents would elevate this assertion that the Vanko court rejected.

¶54 However, it is important to keep in mind an additional principle arising from Vanko——the focus on a "single sponsoring group." Id. at 215. Although the Superintendent is not limited to corporate documents exclusively, corporate documents may

22

often be determinative. Indeed, as Holy Trinity explains, "where a religious school demonstrates by a corporate charter and bylaws that it is independent of, and unaffiliated with, a religious denomination, that in the absence of fraud or collusion the inquiry stops there." Holy Trinity, 82 Wis. 2d at 157-58. But where corporate documents alone do not resolve the inquiry, the Superintendent is permitted to consider other neutral sources of information.

¶55 We thus conclude this methodological inquiry, determining that in examining whether schools are "affiliated with the same religious denomination" pursuant to Wis. Stat. § 121.51, the Superintendent is not limited to consideration of a school's corporate documents exclusively. In conducting a neutral and secular inquiry, the Superintendent may also consider the professions of the school with regard to the school's self-identification and affiliation, but the Superintendent may not conduct any investigation or surveillance with respect to the school's religious beliefs, practices, or teachings.

¶56 Accordingly, we answer the certified question and remand to the United States Court of Appeals for the Seventh Circuit for further proceedings.

*By the Court.*—Certified question answered and cause remanded to the United States Court of Appeals for the Seventh Circuit.

23

¶57 PATIENCE DRAKE ROGGENSACK, J. *(concurring).* The question before the Seventh Circuit Court of Appeals is whether St. Augustine is "affiliated with the same religious denomination" for purposes of Wis. Stat. § 121.51(1) as is St. Gabriel, a Catholic school, whom all agree is "affiliated with" the Archdiocese of Milwaukee. The answer to this question turns on the meaning of "affiliated with." There is no need to become involved in a factual examination of the religious teachings of the private schools that are being compared or the religious teachings of the organization with which they are claimed to be affiliated.

¶58 Rather, I agree with Justice Hagedorn that to be "affiliated with" in a way that will result in overlapping attendance areas of St. Augustine's and St. Gabriel's schools pursuant to Wis. Stat. § 121.51(1) requires a "mutual organizational relationship" between St. Augustine and the religious denomination with which St. Gabriel is affiliated.[1] That is, St. Augustine and the religious denomination, here the Archdioceses of Milwaukee, must mutually agree to be affiliated with one another. Because the majority opinion overlooks the dispositive legal issue of mutuality in the phrase "affiliated with" from § 121.51(1), and instead focuses on a variety of factual inquiries that will not assist the Seventh Circuit Court of Appeals move forward in its decisional process, I do not join the majority opinion, but respectfully concur.

---

[1] Justice Hagedorn's concurrence, ¶¶71, 85.

## I. BACKGROUND

¶59 The historic background underlying the certified question from the Seventh Circuit Court of Appeals is ably set out in the majority opinion and in the concurrence of Justice Hagedorn.[2] The certification invited us "to re-formulate" the certified question, indicating that the Seventh Circuit realized there may be more that would underlie compliance with their request than might be apparent in the words chosen for the certified question.[3] In response, we asked the parties to address First Amendment concerns that may bear on our assisting the Seventh Circuit in addition to the certified question. However, no party did so.[4]

## II. DISCUSSION

### A. Standard of Review

¶60 The dispositive issue in this case is the meaning of "affiliated with," as that phrase is used in Wis. Stat. § 121.51(1). Statutory interpretation presents a question of law that we decide independently. State v. Guarnero, 2015 WI 72, ¶12, 363 Wis. 2d 857, 867 N.W.2d 400.

### B. Statutory Interpretation

¶61 Our interpretation of the meaning of the phrase, "affiliated with" in Wis. Stat. § 121.51(1), begins with the

---

[2] Majority op., ¶¶7-11; Justice Hagedorn's concurrence, ¶¶76-84.

[3] St. Augustine Sch. v. Taylor (St. Augustine IV), No. 17-2333, 6 (7th Cir. Feb. 16, 2021).

[4] Majority op., ¶¶37, 38.

words chosen by the legislature. Spiegelberg v. State, 2006 WI 75, ¶17, 291 Wis. 2d 601, 717 N.W.2d 641. Context also is important when determining the plain meaning of a statute. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110.

¶62 Wisconsin Stat. § 121.51(1) provides in relevant part:

> The attendance areas of private schools affiliated with the same religious denomination shall not overlap unless one school limits its enrollment to pupils of the same sex and the other school limits its enrollment to pupils of the opposite sex or admits pupils of both sexes.

(Emphasis added). Affiliated is not a defined term; therefore, we employ its "common, ordinary and accepted meaning." Kalal, 271 Wis. 2d 633, ¶45.

¶63 We often determine common meanings by consulting a dictionary. Guarnero, 363 Wis. 2d 857, ¶16. When I do so here, I note that an "Affiliate [is] an organization that is connected with or controlled by another, usually larger, organization. [For example] Our college is an affiliate of the university." Affiliate, Cambridge Dictionary, dictionary.cambridge.org, https://dictionary.cambridge.org/dictionary/english/affiliate?q= Affiliate (last visited June 21, 2021). To be "affiliated with" requires a mutuality of connection between the "affiliate" and the entity with which there is an affiliation. That is, to be affiliated with is "to be officially connected with or controlled by another." Id. From a common meaning perspective, one cannot be affiliated with another organization if there is no mutual connection between the two organizations.

¶64 "Affiliated with" is a phrase used in decisions that occur in other contexts, sometimes frequently. For example, cases involving union activities or union employees may arise when there is a question about whether workers on a particular job are affiliated with a particular union, e.g., with the AFL-CIO, such that picketing can or cannot occur. Upper Lakes Shipping, Ltd. v. Seafarers' Int'l Union of Canada, 18 Wis. 2d 646, 659, 119 N.W.2d 426 (1963). Workers join a union and the union accepts their membership when it appears to be to their mutual benefit to do so. Id.

¶65 In Cape v. Plymouth Congregational Church, 130 Wis. 174, 109 N.W. 928 (1906), we discussed criteria that were considered in determining whether a congregation had withdrawn from affiliation with the Primitive Methodist denomination when the congregation chose to become a Congregational denomination. Id. at 179. We explained that to be a member of a synodical organization, "at least two things are essential: A profession of the accepted faith and a submission to its government." Id. at 181. We reasoned that because the deed of trust for the land on which the church building stood said that the church property was to be used by a Methodist denomination, the Primitive Methodist congregation could not be excluded from use of the church facility. Id. at 186. Again, there was a mutuality in the affiliation between the Primitive Methodist denomination and Cape et al that was not present with a Congregational denomination that challenged the Primitive Methodist's right to use the church building.

4

¶66 As Justice Hagedorn notes, the phrase, "affiliated with," has been used in several statutes.[5] One such statute deals with cemeteries and religious societies that are affiliated with cemeteries. Wisconsin Stat. § 157.63(6) creates potential liability for damages for a religious society with whom a cemetery is affiliated when the cemetery or cemetery authority fails to comply with statutory requirements. Section 157.63(6) provides:

> The religious society that is affiliated with a cemetery to which a certification under this section applies is liable for the damages of any person that result from the failure of the cemetery or cemetery authority to fully comply wit s. 157.11(9g) or 157.12(3) during the reporting period under s. 157.62(2) for which such compliance has been certified under this section.

The obligations that arise by virtue of § 157.63(6) imply that a religious society could not be affiliated with a cemetery absent mutual agreement to affiliate because such an affiliation comes with obligations that the religious society must meet if the cemetery does not comply with statutory requirements.

### III. CONCLUSION

¶67 In sum, my review shows that the common dictionary definition of "affiliate," the way in which we have interpreted "affiliation" in matters relating to unions, our interpretation of "affiliate" in other legal contexts and our interpretation of "affiliated with" in other statutes have been consistent with one another. All require express or implied mutual agreement to

---

[5] Justice Hagedorn's concurrence, ¶¶96, 97.

5

connection between the persons and entities that are affiliated. Therefore, in regard to the case before us, I conclude that "affiliated with" pursuant to Wis. Stat. § 121.51(1) requires a mutual organizational relationship between St. Augustine and the Archdiocese of Milwaukee, the religious denomination with which St. Gabriel is affiliated. Accordingly, the Seventh Circuit Court of Appeals should consider those facts presented to it that bear on whether St. Augustine and the Archdiocese of Milwaukee have mutually agreed that their organizations are affiliated with each other.

¶68 Because the majority opinion does not address the dispositive legal issue presented by this controversy, I respectfully concur.

¶69 BRIAN HAGEDORN, J. *(concurring).* The Seventh Circuit Court of Appeals poses a methodological question to this court: what evidence may be considered when determining whether private schools are "affiliated with the same religious denomination" under Wis. Stat. § 121.51(1) (2019-20)?[1] The parties agree the answer includes both the self-representations of a school as well as corporate documents. In a narrow opinion, the majority reiterates this conclusion, which I agree with and join. However, this answer may not be of much assistance to the Seventh Circuit without the requisite statutory analysis explaining what this information may be used for under the law. Therefore, I write separately to examine what a "religious denomination" is under the statute and what it means for a school and a religious denomination to be "affiliated with" one another.

¶70 In short, to obtain public transportation aid for its students, a private school in Wisconsin must draw an attendance area defining the region from which the public school district must transport its students. Wis. Stat. §§ 121.51(1); 121.54(2)(b)1. And the "attendance areas of private schools affiliated with the same religious denomination shall not overlap." § 121.51(1). As the subsequent analysis will show, a religious denomination under the law is not the same thing as a religious faith; rather, statutory context reveals that "religious denomination" is a kind of religious organization. A

_____

[1] All subsequent reference to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

1

school——itself an organizational entity——must be "affiliated with" this type of religious organization. And "affiliated with" in this context involves a mutual organizational relationship. Both the private school and the religious denomination must agree to be affiliated with each other. This statutory inquiry is organizational, not theological.

¶71 Therefore, Wis. Stat. § 121.51(1) prohibits overlapping attendance areas only when multiple schools have a mutual organizational relationship with a single religious denomination. In answer to the Seventh Circuit's certified question, a school's general description of its religious beliefs is unlikely to constitute relevant evidence because a statement of faith, even shared faith, does not demonstrate a mutual organizational relationship with a religious denomination. Affiliation requires more than a shared faith. On the other hand, a school's statement on its website or elsewhere that it is or is not affiliated with a religious denomination is relevant evidence of a mutual organizational relationship. Likewise, corporate documents, by-laws, and other types of organizational documents can also (oftentimes conclusively) demonstrate the presence or lack of a mutual organizational relationship between a school and a religious denomination.

I. STATUTORY ANALYSIS

¶72 Two statutory provisions work together to provide for and place limits on the availability of transportation aid for pupils attending private schools.

¶73 Wisconsin Stat. § 121.54(2)(b)1. provides:

> [T]he school board of each district operating high school grades shall provide transportation to and from the school a pupil attends for each pupil residing in the school district who attends any elementary grade, including kindergarten, or high school grade at a private school located 2 miles or more from the pupil's residence, if such private school is a school within whose attendance area the pupil resides and is situated within the school district or not more than 5 miles beyond the boundaries of the school district measured along the usually traveled route.

This subdivision directs school districts to provide transportation to K-12 students attending private schools if four conditions are satisfied: (1) the student lives in the district; (2) the student lives at least two miles away from the private school; (3) the student lives within the private school's "attendance area"; and (4) the private school is located in or within five miles of the district's boundaries.[2]

¶74 The third condition is further informed by the definition of "attendance area" in Wis. Stat. § 121.51(1):

> "Attendance area" is the geographic area designated by the governing body of a private school as the area from which its pupils attend and approved by the

---

[2] A school district has several options to satisfy its obligation under Wis. Stat. § 121.54(2)(b)1., including by providing transportation for a pupil directly or by compensating the pupil's parent or guardian for the pupil's transportation costs. Wis. Stat. § 121.55(1).

school board of the district in which the private school is located. If the private school and the school board cannot agree on the attendance area, the state superintendent shall, upon the request of the private school and the board, make a final determination of the attendance area. <u>The attendance areas of private schools affiliated with the same religious denomination shall not overlap</u> unless one school limits its enrollment to pupils of the same sex and the other school limits its enrollment to pupils of the opposite sex or admits pupils of both sexes.

(Emphasis added.) The dispute in this case concerns the restriction on overlapping attendance areas for "private schools affiliated with the same religious denomination."[3] Id. Unless the statute's exception for sex-specific schools applies, schools affiliated with the same religious denomination must have mutually exclusive attendance areas.

¶75 Wisconsin Stat. §§ 121.51 and 121.54 have entitled students attending private schools to transportation aid for more than fifty years. See generally §§ 33-40, ch. 313, Laws of 1967. How these statutes came to be informs their meaning, so we begin there.[4]

---

[3] The dissent aptly characterizes this provision as the "overlapping attendance area" provision, a label employed in this concurrence as well. See dissent, ¶110.

[4] "By analyzing the changes the legislature has made over the course of several years, we may be assisted in arriving at the meaning of a statute." Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶22, 309 Wis. 2d 541, 749 N.W.2d 581. An inquiry into statutory history is part and parcel of a plain meaning analysis. Fabick v. Evers, 2021 WI 28, ¶30 n.12, 396 Wis. 2d 231, 956 N.W.2d 856.

4

A. Historical Context

¶76 In 1968, the legislature enacted Wis. Stat. § 121.54(2)(b), directing school districts to provide students attending private schools transportation directly to their schools.[5] § 40, ch. 313, Laws of 1967. As initially enacted, § 121.54(2)(b) did not prohibit overlapping attendance areas, or even use the phrase "attendance area." Instead, in addition to the other three conditions still found in the statute, a district was obligated to provide transportation to a private school only "if such private school [was] the nearest available private school which the pupil may reasonably choose to attend." Wis. Stat. § 121.54(2)(b)1.-2. (1967-68).

¶77 This "may reasonably choose to attend" language proved problematic almost immediately, and in short order became the focus of litigation before this court. See State ex rel. Knudsen v. Bd. of Educ., Elmbrook Schs., Joint Common Sch. Dist.

_____

[5] This was not the legislature's first attempt to provide public transportation aid to private school students. In 1962, the legislature passed a law entitling students attending private schools to receive free school transportation. Ch. 648, Laws of 1961. We struck down this law before it went into effect for violating Article I, Section 18 of the Wisconsin Constitution "which prohibits the expenditure of any public funds 'for the benefit of religious societies, or religious or theological seminaries.'" State ex rel. Reynolds v. Nusbaum, 17 Wis. 2d 148, 165-66, 115 N.W.2d 761 (1962) (quoting Wis. Const. art. I, § 18). In response to that decision, the people ratified Article I, Section 23 of the Wisconsin Constitution in April 1967, providing: "Nothing in this constitution shall prohibit the legislature from providing for the safety and welfare of children by providing for the transportation of children to and from any parochial or private school or institutions of learning." Wis. Const. art. I, § 23.

No. 21, 43 Wis. 2d 58, 168 N.W.2d 295 (1969). The Knudsen case arose when a school district established "service areas" defining which of the four Catholic schools students from each geographic area of the district could reasonably choose to attend. Id. at 62-63. A parent in the district requested and was denied transportation for his daughter to attend a Catholic high school that did not correspond to his daughter's district-assigned service area. Id. at 63. The parent sought a writ of mandamus to compel the district to provide transportation to his daughter's preferred Catholic school. Id. at 64. We held that the statute gave the pupil the choice of which school to attend, but added that deciding "whether that choice is reasonable is to be determined in the discretion of the school board." Id. at 65. And the school board's exercise of its discretion required "a weighing of conflicting factors which may very well vary in accordance with the subjective needs of the student and the particular problems of the school district." Id. at 66.

¶78 Less than three months later, the legislature responded to our Knudsen decision by amending Wis. Stat. § 121.54(2)(b) and creating Wis. Stat. § 121.51(1). §§ 304c, 304j, ch. 154, Laws of 1969. The new law replaced the "may reasonably choose to attend" language with the "attendance area" provision and definition described above. Id. In adopting this change, the legislature retained the "service areas" concept, but assigned the task of drawing what it now termed "attendance areas" to the private schools themselves, subject to the

6

overlapping attendance area provision and the school board's approval.

¶79 In the decade following Knudsen and the 1969 amendment, we decided two cases that applied Wis. Stat. § 121.51(1)'s overlapping attendance area provision: State ex rel. Vanko v. Kahl, 52 Wis. 2d 206, 188 N.W.2d 460 (1971), and Holy Trinity Comm. Sch., Inc. v. Kahl, 82 Wis. 2d 139, 262 N.W.2d 210 (1978).

¶80 Vanko involved an original action petition, filed shortly after the 1969 amendment, seeking a declaration that Wis. Stat. § 121.51(1)'s restriction on overlapping "attendance areas of private schools affiliated with the same religious denomination" was unconstitutional. Id. at 210. In our decision, we acknowledged that the most natural reading of the provision likely rendered it unconstitutional because it imposed a restriction on private religious schools and not on private secular schools. Id. at 213-14. However, the Vanko court devised a construction of the statute to avoid the constitutional infirmity, reading "the statute as not authorizing or permitting overlapping in attendance area boundary lines as to all private schools affiliated or operated by a single sponsoring group, whether such school operating agency or corporation is secular or religious." Id. at 215.

¶81 Dissenting, Chief Justice Hallows objected that under the majority's reading, "the plain language 'the same religious denomination' now becomes a single operating group and 'religious' is read out of the classification." Id. at 218

7

(Hallows, C.J., dissenting). In so doing, the court gave "a construction to these statutes beyond the breaking point and . . . construed them to mean exactly the opposite of what the legislature plainly said and intended."[6] Id. at 217 (Hallows, C.J., dissenting).

¶82 The second case to interpret the overlapping attendance area provision involved a challenge to the superintendent's conclusion that a particular school was unaffiliated with the Roman Catholic denomination. Holy Trinity, 82 Wis. 2d at 141. Following our decision in Vanko, Holy Trinity School, which until then had been operated by a Roman Catholic congregation, dissolved itself, and a new school named Holy Trinity Community School incorporated. Id. at 145-46. The newly incorporated school featured the same students, teachers, and buildings as the prior Holy Trinity School. Id. at 146. But, as its corporate documents explained, Holy Trinity Community School was officially an independent school,

---

[6] Chief Justice Hallows' critique, echoed by the dissent in today's decision, rings loudly. See dissent, ¶¶112-16. However, even if Vanko was wrongly decided, none of the parties in this case ask us to revisit Vanko despite our invitation to address this question. I do not disagree with the dissent's contention that it is improper in some circumstances to accept unchallenged precedent as an analytical starting point. See dissent, ¶¶103-04. But while I too would welcome an opportunity to revisit Vanko for many of the reasons well-stated in the dissent, we do not need to do so to answer the question the Seventh Circuit asked us. Our answer to the certified question does not prevent a future reconsideration of this line of cases. We answer a narrow state law question to assist the Seventh Circuit in addressing the factual and constitutional questions properly addressed to their judgment, not ours.

having "no legal ties to the Roman Catholic church" and, according to its bylaws, having "no affiliation with any religious denomination." Id. at 146. The superintendent challenged Holy Trinity Community School's claim, "contend[ing] that the mere separation of the school, as a legal entity, from the Catholic Church, of which it was previously a part, is insufficient to show that it is no longer affiliated with that denomination." Id. at 147-48.

¶83 We unanimously rejected the superintendent's argument, explaining that the First Amendment forbade the superintendent from "determin[ing] the denominational allegiance of the institution" based on it's "inspection and surveillance of the school." Id. at 149. Rather, we accorded "facial validity to the charter and bylaws," and observed that the school "expressly disavow[ed] affiliation with any church denomination." Id. at 154. "[T]o inquire further," we said, "impinges on the religious right of citizens to make their own declaration in respect to their religious affiliation." Id. The First Amendment obligated us "to accept the professions of the school and to accord them validity without further inquiry."[7] Id. at 155. Holy Trinity Community School was therefore "a private school, independent of any religious denomination; and,

_____

[7] We noted just one exception, explaining that "courts reserve the right to look behind such decisions where there is evidence of fraud or collusion." Holy Trinity Comm. Sch., Inc. v. Kahl, 82 Wis. 2d 139, 155, 262 N.W.2d 210 (1978). If fraud were "alleged and proved, we would look behind a representation which on its face purported to demonstrate a complete lack of denominational affiliation." Id.

accordingly, as a matter of law it [was] entitled to a district-wide attendance area." Id.

¶84 Neither Vanko nor Holy Trinity conducted a full statutory analysis of what the overlapping attendance area provision means when it says "private schools affiliated with the same religious denomination."[8] See Wis. Stat. § 121.51(1). Vanko's statutory interpretation, such as it was, was limited to reading "same religious denomination" as functionally analogous to "single sponsoring group"; it said nothing about how affiliation occurs. 52 Wis. 2d at 215. And Holy Trinity relied primarily on the Constitution to reverse the superintendent's decision. 82 Wis. 2d at 154-55. It didn't say much about what a "religious denomination" is or what it means for a school to affiliate with one. The majority in this case limits its analysis to the types of evidence that could be relevant to affiliation, similarly declining a thoroughgoing analysis of the words of the statute. Majority op., ¶¶5, 40, 55. In my view, the statutory language clarifies how a court should employ the methodology articulated in the majority opinion, and provides the necessary context for our answer to the Seventh Circuit's certified question.

---

[8] Wisconsin Stat. §§ 121.51(1) and 121.54(2)(b) have undergone slight revisions since Vanko and Holy Trinity, but no changes since then affect our interpretation of the overlapping attendance area provision.

10

## B. Analyzing the Text

¶85 A proper interpretation of "affiliated with the same religious denomination" requires a deeper dive into the meaning of two phrases: "religious denomination" and "affiliated with." Wis. Stat. § 121.51(1). As we shall see, schools are "affiliated with the same religious denomination" when a mutual organizational relationship exists between the schools and the same religious denomination.

### 1. Religious Denomination

¶86 "Religious denomination" is not a defined phrase in our statutes. Nevertheless, related statutes reveal that when a statute says "religious denomination," it is not referring to a religious faith generally, but to a particular kind of religious organization.[9]

¶87 Apart from Wis. Stat. § 121.51(1), the phrase "religious denomination" appears in more than a dozen statutory sections. Many of these are in Chapter 187, titled "Religious Societies," which governs the state's relationship with religious organizations. These sections describe how religious organizations meet, incorporate, govern themselves, and own or manage property. See generally Wis. Stat. §§ 187.01-.09.

---

[9] See State ex rel. Zignego v. WEC, 2021 WI 32, ¶16 & n.9, 396 Wis. 2d 391, 957 N.W.2d 208 (illustrating that technical terms and phrases in the statutes need not always be statutorily defined); see also Wis. Stat. § 990.01(1) ("[T]echnical words and phrases and others that have a peculiar meaning in the law shall be construed according to such meaning.").

11

¶88 Wisconsin Stat. § 187.05 is especially noteworthy because it explains how organizations other than churches, including denominations, can take on a corporate form. It explains that a "body of authorized representatives of any church or religious denomination . . . may elect any number of trustees, not less than three, to be incorporated." § 187.05(1). Then, it provides that "[a]ny denominational body mentioned in sub. (1) . . . at any stated meeting may vote to become a corporation and designate any of its members of adult age, not less than 10 in number, to make, acknowledge and file with the department of financial institutions a certificate" containing its pertinent corporate details. § 187.05(3)(a). Next, the section explains that a denomination that has taken corporate form "shall have the power and privileges and exercise the rights and be subject to the obligations imposed upon corporations organized under general law." § 187.05(3)(c). And finally, a denomination may own property and reorganize itself if it so chooses. § 187.05(3)(b), (d). All of these demonstrate that a "religious denomination" is a type of religious organization, not a generic reference to people with a kindred faith.

¶89 Further, Wis. Stat. § 187.08 provides that if a religious society belonging to a religious denomination in this state is dissolved, "the title to such real estate so owned by such defunct society shall be vested in such corporation of the same religious denomination next higher in authority in such denomination." Beyond property acquisition, this section

12

demonstrates that a religious denomination can have a relationship with other organizational entities, here religious societies, such that the denomination and religious societies form something resembling a corporate structure with parent and subsidiary corporations. This type of structure reveals that a religious denomination under Wisconsin law is a kind of organization, not a reference to a group's religious faith.

¶90 Statutes outside Chapter 187 paint the same picture. Wisconsin Stat. § 182.030, for example, explains that a corporation "connected with[] any church or religious denomination or society" may provide in its articles of organization "that it shall be under the supervision and control of such church, denomination, or society." It is an organized body that would supervise and control a corporation. Likewise, Wis. Stat. § 101.05(4)(b) provides a tax exemption for school buildings that are, among other things, "operated by and for members of a bona fide religious denomination." This assumes religious denominations can operate a school—something an organization, and not a religious faith, is capable of.

¶91 The statutes also use the phrase "religious denomination" when referring to entities that ordain or accredit individuals in certain fields. Wisconsin Stat. § 765.16(1m)(a), for example, authorizes an "ordained member of the clergy of any religious denomination" to officiate a marriage. Wisconsin Stat. § 455.02(2m)(i) creates a psychology licensing exemption for "[a]n ordained member of the clergy of any religious denomination." And Wis. Stat. § 979.01(1)(g), which outlines

13

circumstances under which a death must be reported, references an "accredited practitioner of a bona fide religious denomination relying on prayer or spiritual means for healing." A religious faith cannot ordain or accredit individuals as these sections contemplate; instead, there must be an organization that carries out those functions.

¶92 The statutory context paints a clear picture. When the legislature uses the phrase "religious denomination," it is referring to an organizational entity. To be sure, a religious denomination need not take a specific corporate form under Wisconsin law. As the majority observes, "'religious denomination' is a broader category than 'corporation.'" Majority op., ¶52. But every single use of the phrase in the Wisconsin statutes demonstrates that a "religious denomination" is an organizational entity, not a synonym for religious faith generally. Thus, when Wis. Stat. § 121.51(1) asks whether two schools are "affiliated with the same religious denomination," the question is not whether both schools share the same creed, but whether they are both affiliated with a particular kind of religious organization——a religious denomination.[10]

---

[10] This organizational understanding of "religious denomination" is also consistent with Vanko's construction of Wis. Stat. §§ 121.51 and 121.54(2)(b). Regardless of whether it was correct to do so, its decision to read "same religious denomination" synonymously with "single sponsoring group" is telling. See State ex rel. Vanko v. Kahl, 52 Wis. 2d 206, 215, 188 N.W.2d 460 (1971). If "the same religious denomination" meant nothing more than a common religious faith, our use of the "single sponsoring group" terminology would be nonsensical. A denomination that shares even an identical religious faith with an entirely independent private school is not a "single
(continued)

14

## 2. Affiliated With

¶93 Like "religious denomination," the phrase "affiliated with" is not expressly defined in the statutes. But statutory context reveals that it contemplates a mutual relationship between two organizations.[11]

¶94 As an initial matter, a proper characterization of "religious denomination" centers and circumscribes the permissible readings of "affiliated with" in Wis. Stat. § 121.51(1). It is one thing for a school to self-declare their allegiance to a particular religious faith. It is quite another to affiliate with a particular religious organization without that organization's agreement. If a private school could unilaterally affiliate itself with a religious organization, it would deprive that organization of its liberty to decide with

---

sponsoring group" for that school. Religious faiths cannot sponsor schools, but religious organizations can. The Vanko court explained that a "single sponsoring group" is a "school operating agency or corporation." Id. A religious faith is neither an agency nor a corporation; a religious denomination can take on corporate form.

Although Holy Trinity focused primarily on the Constitution, it also agreed with the organizational understanding of "religious denomination." Summarizing Vanko, the Holy Trinity court explained that "the effect of the statute was to prohibit overlapping attendance districts in respect to . . . religious schools affiliated or operated by a single sponsoring group or denomination." 82 Wis. 2d at 145.

[11] Because it is not a technically or specially defined phrase, we give "affiliated with" its "common, ordinary, and accepted meaning." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.

15

whom and with which organizations it chooses to associate. On this basis alone, the most reasonable reading of "affiliated with" in Wis. Stat. § 121.51(1) requires some mutual relationship between the private school and the religious denomination, whereby both agree to be affiliated.

¶95 The history that prompted the enactment of the overlapping attendance area provision supports this reading. After the Knudsen decision gave districts discretion to decide which private school a student could "reasonably choose to attend," the legislature immediately amended the statute to shift that discretion to the private schools in the first instance, subject to districts' approval. Supra, ¶10. But the legislature nevertheless directed private schools with the same denominational affiliation to draw non-overlapping attendance areas. The most reasonable inference from this statutory history is that by adding the overlapping attendance area provision, the legislature contemplated that the drawing of non-overlapping attendance areas is something that could be facilitated by the religious denomination——or in the words of Vanko, a single sponsoring group. It makes no sense to read the statute as asking separate organizations with no relationship (other than perhaps shared religious convictions) to draw limited attendance areas together. "[A]ffiliated with" must contemplate a mutual relationship between two organizations that agree to associate with one another.[12]

---

[12] Our opinion in Vanko understood this in its focus on the "single sponsoring group" terminology. 52 Wis. 2d at 215. A

(continued)

16

¶96 Context from other statutes confirms this. Most notably, Chapter 157, which regulates cemeteries, routinely contains separate provisions for cemeteries that are "affiliated with a religious association."

- Wis. Stat. § 157.07(6) provides that certain platting requirements do "not apply to . . . a cemetery authority of a cemetery that is affiliated with a religious association."

- Wis. Stat. § 157.08(5) governs conveyances of cemetery lots but partially exempts cemeteries that are "affiliated with a religious association" from its reach.

- Wis. Stat. § 157.11(10) governs improvement and care of cemetery lots but partially exempts cemeteries that are "affiliated with a religious association."

- Wis. Stat. § 157.63(6) holds a "religious society that is affiliated with a cemetery" liable for damages "that result from the failure of the cemetery" to comply with certain statutory requirements.

- Wis. Stat. § 157.635 permits cemeteries "affiliated with a religious association" to limit who may be buried in a cemetery.

- Wis. Stat. § 157.637 forbids cemeteries, other than cemeteries "organized and operated by, or affiliated with, a religious association" from forbidding veteran burials.

---

single group sponsoring a school necessarily describes a mutual tie between two organizations that choose to be connected.

17

It would turn the cemetery statutes on their head if any cemetery could self-affiliate with a religious association, especially Wis. Stat. § 157.63(6)'s provision extending liability to the religious organization the cemetery chose to affiliate with. Quite clearly then, Chapter 157 uses "affiliated with" to contemplate a mutual relationship between cemeteries and religious associations.

¶97 Similarly, Wis. Stat. § 628.92(5)(b) requires navigators "not affiliated with an entity" to furnish a bond. Surely a navigator cannot avoid a bond requirement simply by self-affiliating with another entity. Likewise, Wis. Stat. § 16.99(3p) defines a "public museum" as "a nonprofit or publicly owned museum located in this state that is accredited by the American Association of Museums or an educational center that is affiliated with such a museum." Could an educational center merely self-affiliate with an accredited museum to satisfy this definition? Certainly not.

¶98 So too in Wis. Stat. § 121.51(1). When the overlapping attendance area provision says "affiliated with the same religious denomination," it means that there must be a mutual relationship that ties the private school and the religious denomination together.[13] Both entities must choose to affiliate with each other; neither can unilaterally self-

---

[13] Adding additional research from our cases and reference to dictionary definitions, Justice Roggensack's concurrence agrees that a mutual organizational relationship is the most reasonable interpretation of the statutory language. Justice Roggensack's concurrence, ¶¶61-67.

18

affiliate with the other.[14]  This statutory inquiry is not a question of theological symmetry, but of organizational connection.

## II.  THE CERTIFIED QUESTION

¶99 With this statutory background, the answer to the Seventh Circuit's question comes into fuller view.  The Seventh Circuit asks whether the Superintendent must "rely exclusively on neutral criteria such as ownership, control, and articles of incorporation, or may the superintendent also take into account the school's self-identification in sources such as its website or filings with the state."  As the majority observes, however, depending on what is meant by a "school's self-identification," this question may present "a false dichotomy."  Majority op., ¶50.

¶100 The Superintendent certainly must rely "exclusively on neutral criteria" to demonstrate a school's affiliation with a religious denomination.  The statute's aim is neutral (organizational connection).  And as we held in Holy Trinity, the Constitution provides further limits.  Although "ownership,

---

[14] To the extent the majority opinion discusses "the professions of the school with regard to the school's self-identification and affiliation," majority op., ¶¶5, 55, I understand it to be discussing the school's self-identification about its mutual affiliation with a religious denomination.  A school may not unilaterally self-affiliate with a denomination, but its statements professing to be affiliated with a denomination may be evidence of a mutual organizational relationship between it and the religious denomination it professes to be affiliated with.

19

control, and articles of incorporation" are examples of neutral criteria (and often may be determinative), other types of evidence might permissibly be considered. For example, a school's profession on its website that it is an unaffiliated religious school would constitute evidence that the school shares no mutual organizational relationship with a religious denomination.[15]

¶101 Therefore, in answer to the certified question, I join the majority's conclusion that statements of affiliation by a school on its website, in filings with the state, or otherwise, along with corporate documents, may be permissible sources of evidence regarding whether two schools are affiliated with a religious denomination. This statutory inquiry, however, is organizational, not theological. A religious denomination under the law is a kind of religious organization, not a religious creed. And a school is affiliated with a religious denomination if there exists a mutual organizational relationship between the private school and the religious denomination. With this understanding, I respectfully concur.

---

[15] The parties in this case do not disagree on whether statements on a website may be relevant. They do disagree on what kind of statements may be relevant and how they may be used.

20

¶102 REBECCA GRASSL BRADLEY, J. *(dissenting).* "[A] law repugnant to the constitution is void." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 180 (1803). Wisconsin Stat. § 121.51(1) is repugnant to the Constitution and therefore void. In answering the certified question, this court should say so. Fifty years ago in State ex rel. Vanko v. Kahl, 52 Wis. 2d 206, 188 N.W.2d 460 (1971), this court overstepped its judicial boundaries and rewrote the statute in order to save it. Vanko embodies an egregious example of legislating from the bench and should be overturned. Instead, the majority answers the certified question in a manner which unconstitutionally entangles state authorities in the religious affairs of private schools. It is of no import that none of the parties asked us to overrule Vanko in this dispute. We ordered the parties to address whether Vanko should be revisited, and the question is squarely before us notwithstanding the parties' negligible treatment of the subject. Litigants do not dictate the decisions of this court; the law does. As proclaimed over 160 years ago, "[w]e sit here to decide the law as we find it, and not as the parties or others may have supposed it to be." Ross v. Bd. of Outagamie Cnty. Supervisors, 12 Wis. 26, 44 (1860) (Dixon, C.J., dissenting).

¶103 The Wisconsin Supreme Court serves a law-development function. State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 436, 424 N.W.2d 385 (1988) ("[I]t is this court's function to develop and clarify the law."). "In a legal system in which appellate opinions not only establish the meaning of

1

law, but do so through precedent that binds future litigants, courts cannot cede to the parties control over legal analysis." Amanda Frost, The Limits of Advocacy, 59 Duke L.J. 447, 453 (2009). In this case, the majority does a great disservice to the people of Wisconsin by letting three parties control the law for an entire state.

¶104 The logical implications of the majority's reasoning are concerning, if not absurd. In future cases, will the court refuse to follow binding precedent if no party cites it? Presumably, "[n]o one would argue that a court is free to ignore a binding precedent simply because the parties fail to cite it." Id. at 494. But if we cannot reconsider our own precedent because the parties didn't ask us to do so, the majority's reasoning would also preclude us from considering any case the parties didn't mention. What if a case has been cited, perhaps even by both parties, but we disagree with their reading of it? Are we now obligated to read our own prior decisions through the lenses of partisan litigants?

¶105 The majority's aberrantly restrictive vision of our role consigns the state's highest court to selecting winners and losers in litigation contests rather than declaring the law. However, "courts do not simply resolve disputes between parties; they are also responsible for making pronouncements of law that are binding on all who come after. When the parties fail to raise relevant legal claims and arguments——whether by error or through conscious choice——judges must do so themselves to avoid issuing inaccurate or incomplete statements of law." Id. at

2

447. Doing so does not abandon our neutral role; it embraces it, while serving as "an essential means of protecting the judiciary's role in the constitutional structure." Id. at 452.

¶106 Read in conjunction with Wis. Stat. § 121.54(2)(b), Wis. Stat. § 121.51(1) precludes public school districts from providing transportation to students who attend a private school if the school district decides that the school is "affiliated with the same religious denomination" as another private school within the same geographic attendance area whose students already receive such transportation. On its face, the statute imposes a restriction on the receipt of public benefits applicable only to religious schools. Recognizing the constitutional infirmities of this statutory scheme, the Vanko court impermissibly excised the phrase "religious denomination" from the statute by applying § 121.51(1)'s overlapping-attendance-area exclusion to religious and secular schools alike.

¶107 Prioritizing the parties' collective preference to preserve the statute over our duty to faithfully interpret the law as written, the majority declines to revisit the Vanko court's mangling of the statute. However, "[t]he principle of stare decisis does not compel us to adhere to erroneous precedent or refuse to correct our own mistakes." State v. Outagamie Cnty. Bd. of Adjustment, 2001 WI 78, ¶31, 244 Wis. 2d 613, 628 N.W.2d 376. Regardless of the particular interests of the parties in perpetuating Vanko's improper reworking of the statute, our duty to the Constitution is

3

primary. "We do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision." Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶100, 264 Wis. 2d 60, 665 N.W.2d 257 (internal citations omitted).

¶108 Had the majority confronted Vanko's errors, it would have necessarily concluded that Wis. Stat. § 121.51(1) is unconstitutional under the First Amendment to the United States Constitution. It is the duty of this court "to say what the law is," Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶50, 382 Wis. 2d 496, 914 N.W.2d 21 (quoting Marbury, 5 U.S. at 177), to "faithfully give effect to the laws enacted by the legislature" by applying the plain language of a statute, State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110, and to ensure those enacted laws are in conformity with our Constitution. This court in Vanko violated each of these responsibilities. The majority in this case repeats the error. I respectfully dissent.

## I. Vanko should be overruled because the court rewrote Wis. Stat. § 121.51(1).

¶109 In the interests of the "safety and welfare of children," the Wisconsin Constitution allows the legislature to "provid[e] for the transportation of children to and from any parochial or private school or institution of learning." Wis. Const. art. I, § 23. Following the adoption of this constitutional provision in 1967, the legislature enacted Wis. Stat. § 121.54(2)(b), which provides in relevant part:

4

> [T]he school board of each district operating high school grades shall provide transportation to and from the school a pupil attends for each pupil residing in the school district who attends any elementary grade, including kindergarten, or high school grade at a private school located 2 miles or more from the pupil's residence, if such private school is a school within whose <u>attendance area</u> the pupil resides and is situated within the school district or not more than 5 miles beyond the boundaries of the school district measured along the usually traveled route.

(Emphasis added.) Under this law, school districts must provide students with transportation to and from private schools, so long as certain criteria are met.[1] Specifically, the student must reside at least two miles from the school and within that school's "attendance area," and the private school must be within five miles of the school district's boundaries. In turn, the State provides aid to the school district at specified rates depending upon the location of students transported by the district. See Wis. Stat. § 121.58(2).

¶110 Wisconsin Stat. § 121.51(1) defines "attendance area" as "the geographic area designated by the governing body of a private school as the area from which its pupils attend and approved by the school board of the district in which the private school is located." Any disagreement over the scope of the "attendance area" must be resolved by the state superintendent of public instruction (SPI): "[i]f the private school and the school cannot agree on [an] attendance area, the state superintendent shall, upon the request of the private

---

[1] Wisconsin Stat. § 121.55 prescribes methods of transportation.

5

school and the board, make a final determination of the attendance area." § 121.51(1). As particularly relevant to the certified question before this court, § 121.51(1) also mandates a limitation applicable only to religious schools: "[t]he attendance areas of private schools affiliated with the same religious denomination shall not overlap."[2] (Emphasis added.) (hereinafter the "overlapping attendance area" provision).

¶111 Reading Wis. Stat. § 121.51(1) in conjunction with Wis. Stat. § 121.54(2)(b), the provision prohibiting overlapping attendance areas requires school districts to deny transportation to students who attend a private school "affiliated with the same religious denomination" as another private school within the same geographic attendance area whose students already receive transportation. In other words, if two religious schools belong to the same "religious denomination"——a term statutorily undefined and subject to the interpretation of the SPI——students attending one of the religious schools are denied transportation, regardless of their distance from the school. The Constitution prohibits such faith-based discrimination in conferring public benefits.

¶112 Soon after this statute's enactment, religious schools and parents of children attending them challenged the constitutionality of the provision prohibiting overlapping attendance areas of private schools "affiliated with the same

---

[2] This mandate is subject to an exception involving single-sex schools which is not pertinent to the matter before the court. Wis. Stat. § 121.51(1).

6

religious denomination." Instead of confronting its glaring unconstitutionality, the Vanko court rewrote Wis. Stat. § 121.51(1) in order to cure its "apparent constitutional infirmity." Vanko, 52 Wis. 2d at 214. Although § 121.51(1) plainly prohibits overlapping attendance areas of only those schools "affiliated with the same religious denomination," the Vanko court "read the statute as not authorizing or permitting overlapping in attendance area boundary lines as to all private schools affiliated or operated by a single sponsoring group, whether such school operating agency or corporation is secular or religious." Id. at 215 (emphases added). To support its "reading" of § 121.51(1), the Vanko court effectively replaced the phrase "religious denomination" with "single sponsoring group" (ostensibly a secular phrase) so as to apply the statute's restriction to both secular and religious schools. Amending the law by judicial fiat, reasoned the Vanko court, prevents "[r]eligious affiliation [from being] the sole basis of the classification" and fulfills the statute's overarching purpose of providing "for the safety and welfare of school children." Id. at 214. As further support for taking this legislative action, the Vanko court misapplied the constitutional doubt canon of statutory construction: "[i]f there were any doubt as to this being the correct construction of the statute, . . . [it] use[s] the statutory construction rule that, given two alternative constructions of a statute, preference is to be given to the one that saves the statute from being struck down as unconstitutional." Id. at 215.

7

¶113 The Vanko court's blatant judicial activism was not lost on all members of the court. Noting the unconstitutionality of the statute, dissenting Chief Justice E. Harold Hallows pointed out that "[i]n order to save the constitutionality of [the 'overlapping attendance area' provision] . . . , the majority has given a construction to these statutes beyond the breaking point and has construed them to mean exactly the opposite of what the legislature plainly said[.]" Id. at 217 (Hallows, C.J., dissenting). In the court's reconstruction of the statute, "the plain language 'the same religious denomination' now becomes a 'single operating group' and 'religious' is read out of the classification." Id. at 218. Chief Justice Hallows rightly criticized the court's overreach: "We cannot take clear and unambiguous language and under the guise of construction or interpretation change what the legislature has said." Id. at 219. If the "overlapping attendance area" provision is to apply to religious and secular schools alike, "the legislature must say so." Id.

¶114 Although Vanko is irreconcilable with the plain language of Wis. Stat. § 121.51(1),[3] a majority of this court

---

[3] At the time of the Vanko decision, the "overlapping attendance area" provision was codified in Wis. Stat. § 121.51(4).

nevertheless sustains its erroneous holding.[4] Because Vanko's construction of § 121.51(1) is unmoored from the statutory text, it should be overruled. An invention of the Vanko court, the phrase "single sponsoring group" is nowhere to be found in the statute. Nor does the statutory text apply the "overlapping attendance area" restriction to secular schools. Only students attending private schools "affiliated with the same religious denomination" as another private school within the same geographic attendance area are denied a public benefit——solely on account of their school's religious affiliation.

¶115 In arriving at its holding, the Vanko court trampled over fundamental principles of statutory interpretation, under which we are supposed to "'begin with the language of the statute,'" and when the "meaning of the statute is plain, we ordinarily stop the inquiry." Kalal, 271 Wis. 2d 633, ¶45 (quoted source omitted). We give statutory language "its common ordinary, and accepted meaning," id., and we should never "read into the statute words the legislature did not see fit to write." Dawson v. Town of Jackson, 2011 WI 77, ¶42, 336

---

[4] The majority also errs in upholding Holy Trinity Cmty. Sch., Inc. v. Kahl, 82 Wis. 2d 139, 262 N.W.2d 210 (1978). In that case, this court refined its decision in Vanko to prescribe how the SPI should ascertain whether a religious private school is affiliated with a "sponsoring group." In relevant part, Holy Trinity held that "where a religious school demonstrates by a corporate charter and bylaws that it is independent of, and unaffiliated with, a religious denomination, that in the absence of fraud or collusion the inquiry stops there." Holy Trinity, 82 Wis. 2d at 157-58. Because Holy Trinity rests upon the faulty foundation laid by Vanko, it too should be overturned.

9

Wis. 2d 318, 801 N.W.2d 316. "It is not up to the courts to rewrite the plain words of statutes," State v. Wiedmeyer, 2016 WI App 46, ¶13, 370 Wis. 2d 187, 881 N.W.2d 805, nor can a court "add words to a statute to give it a certain meaning." State v. Neill, 2020 WI 15, ¶23, 390 Wis. 2d 248, 938 N.W.2d 521 (quoted source omitted). "[R]ather, we interpret the words the legislature actually enacted into law." State v. Fitzgerald, 2019 WI 69, ¶30, 387 Wis. 2d 384, 929 N.W.2d 165. If the law offends the Constitution, we are duty-bound to say so.

¶116 The Vanko court began with the language of the statute, acknowledged its "constitutional infirmity," and committed a cavalcade of errors in order to avoid employing the only appropriate judicial remedy——striking the statute. Discarding its obvious meaning, the Vanko court invoked "the purpose of the transportation statute" and declared that a "classification solely on the basis of religious sponsorship would not be germane or reasonably related to the purpose of the statute"——so it deleted it. Through the court's legislative handiwork, the phrase "same religious denomination" became "single sponsoring group." In order to absolve the legislature of an unconstitutional act, the court committed its own, arrogating to itself the power to make law.

¶117 Writing laws resides within the exclusive domain of the legislature, into which judges may not tread. "Like its federal counterpart, '[o]ur state constitution . . . created three branches of government, each with distinct functions and powers,' and '[t]he separation of powers doctrine is implicit in

10

this tripartite division.'" Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶11, 376 Wis. 2d 147, 897 N.W.2d 384 (quoted source omitted; alterations and ellipsis in original). "Three clauses of the Wisconsin Constitution embody this separation: Article IV, Section 1 ('[t]he legislative power shall be vested in a senate and assembly'); Article V, Section 1 ('[t]he executive power shall be vested in a governor'); and Article VII, Section 2 ('[t]he judicial power . . . shall be vested in a unified court system')." Gabler, 376 Wis. 2d 147, ¶11 (alterations and ellipsis in original). "The separation of powers 'operates in a general way to confine legislative powers to the legislature.'" League of Women Voters v. Evers, 2019 WI 75, ¶35, 387 Wis. 2d 511, 929 N.W.2d 209 (quoting Goodland v. Zimmerman, 243 Wis. 2d 459, 467, 10 N.W.2d 180 (1943)).

¶118 "Each branch's core powers reflect 'zones of authority constitutionally established for each branch of government upon which any other branch of government is prohibited from intruding. As to these areas of authority, . . . any exercise of authority by another branch of government is unconstitutional.'" Gabler, 376 Wis. 2d 147, ¶31 (quoting State ex rel. Fiedler v. Wisconsin Senate, 155 Wis. 2d 94, 100, 454 N.W.2d 770 (1990) (ellipsis in original)). "It is 'the province and duty of the judicial department to say what the law is[,]' and not what we think it should be." Town of Wilson v. City of Sheboygan, 2020 WI 16, ¶51, 390 Wis. 2d 266, 938 N.W.2d 493 (Rebecca Grassl Bradley, J., concurring) (quoting Marbury, 5

U.S. at 177). "This court lacks any authority to modify, tweak or supplement the legislature's work." Id.

¶119 In addition to invading the exclusive province of the legislature, the Vanko court violated multiple foundational principles underlying the plain-meaning method of statutory interpretation, which this court adopted long before the Vanko decision. See, e.g., W. Side Bank v. Marine Nat. Exch. Bank, 37 Wis. 2d 661, 669-70, 155 N.W.2d 587 (1968) ("It is not within the province of this Court to seek secondary sources of legislative intent where the meaning of the statute is plain and unambiguous."); Folschow v. Werner, 51 Wis. 85, 7 N.W. 911 (1881) (applying the "plain meaning" of a statute to determine whether a creditor can reach the defendant's pension). In addition to transgressing the constitutional boundaries of the judicial role, the methodology employed by the Vanko court in order to reach a statute-saving outcome contravened basic principles of statutory interpretation.

¶120 The Vanko court was transparent in justifying its reconstruction of the statute: doing so "save[d] the statute from being struck down as unconstitutional." Vanko, 52 Wis. 2d at 215. Although not named by the Vanko court, this principle is known as the constitutional doubt canon of statutory construction. The Vanko court misused it. Properly applied, the constitutional doubt canon counsels that "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 241 (2012). It

12

may be employed only "where a statute is susceptible of two constructions." Id. (quoting United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 408 (1909) (per White, J.)). This court recently expressed the operation of the canon in terms of reasonableness: "where we can reasonably adopt a saving construction of a statute to avoid a constitutional conflict, we do so." State v. Hager, 2018 WI 40, ¶31, 381 Wis. 2d 74, 911 N.W.2d 17. Contrary to the Vanko court's application of the canon, simply "avoid[ing] . . . a constitutional conflict does not drive our reading of the statute." Id. Instead, the constitutional doubt canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that [the legislature] did not intend the alternative which raises serious constitutional doubts." Clark v. Martinez, 543 U.S. 371, 381 (2005) (emphases added).

¶121 There is nothing "reasonable" nor "plausible" about the Vanko court's construction of Wis. Stat. § 121.51(1). The constitutional doubt canon is not a license to rewrite a statute, either to better effectuate its purpose or to conform it to the Constitution. Nor does it authorize a court to insert new words into the text or remove words from it. "We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question." United States v. Locke, 471 U.S. 84, 96 (1985). Nor can we employ the constitutional doubt canon when the text of the statute is plain. See Pennsylvania DOC v. Yeskey, 524 U.S. 206, 212

13

(1998). Although courts "will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it." Aptheker v. Sec'y of State, 378 U.S. 500, 515 (1964) (quoted source omitted). The Vanko court bent the language of § 121.51(1) to the point of changing its meaning. Secular schools cannot be classified by "religious denomination" notwithstanding the Vanko decision's lexical distortions. It should be overturned.

¶122 In perpetuating the judicial malfeasance Vanko embodies, the majority "determine[s] that our precedent should be maintained rather than overruled," implicitly relying on the doctrine of stare decisis. Majority op., ¶46. "While adhering to precedent is an important doctrine for lending stability to the law, not every decision deserves stare decisis effect. After all, the purpose of stare decisis 'is to make us say that what is false under proper analysis must nonetheless be held to be true, all in the interest of stability.'" State v. Grandberry, 2018 WI 29, ¶86, 380 Wis. 2d 541, 910 N.W.2d 214 (Rebecca Grassl Bradley, J., dissenting) (quoting Antonin Scalia, A Matter of Interpretation: Federal Court and the Law 138-40 (1997)). As the state's highest court, we are not "'constrained to follow precedent' that is 'unworkable or badly reasoned,' because stare decisis 'is a principle of policy and not a mechanical formula of adherence to the latest decisions.'" Outagamie Cnty. Bd. of Adjustment, 244 Wis. 2d 613, ¶31 (quoting

14

Payne v. Tennessee, 501 U.S. 808, 827-28 (1991)) (internal alterations omitted).

¶123 "Reflexively cloaking every judicial opinion with the adornment of stare decisis threatens the rule of law, particularly when applied to interpretations wholly unsupported by the statute's text." Manitowoc Co., Inc. v. Lanning, 2018 WI 6, ¶81 n.5, 379 Wis. 2d 189, 906 N.W.2d 130 (Rebecca Grassl Bradley, J., concurring). The Vanko court's construction of "religious denomination" to mean "single sponsoring group" is "wholly unsupported by the statute's text" and represents a revision rather than an interpretation of law. "In evaluating whether to persist in upholding a decision that elevated judicially-imagined legislative purpose over the words the legislature actually enacted, '[i]t is well to keep in mind just how thoroughly [the court's opinion] rewrote the statute it purported to construe.'" Id. (quoting Johnson v. Transp. Agency, 480 U.S. 616, 670 (1987) (Scalia, J., dissenting)). Because the Vanko court entirely rewrote the "overlapping attendance area" provision of Wis. Stat. § 121.51(1), the majority errs in upholding it.

¶124 In Johnson Controls, this court enumerated factors justifying a decision to overturn precedent. See Johnson Controls, 264 Wis. 2d 60, ¶¶98-99. When a prior case is "unsound in principle" or "wrongly decided," it should be overturned. Id., ¶99; see also Bartholomew v. Wisconsin Patients Comp. Fund & Compcare Health Servs. Ins. Corp., 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216. A judicial decision

15

like Vanko, which "blatantly disregarded the text of the [] statute," is "both 'unsound in principle' and 'wrongly decided,'" and should be overruled. Town of Wilson, 390 Wis. 2d 266, ¶63 (Rebecca Grassl Bradley, J., concurring). Doing so would advance the rule of law:

> This court has no apprehension about being a solitary beacon in the law if our position is based on a sound application of this state's jurisprudence. But when our light is dim and fading, then this court must be prepared to make correction. Stare decisis is neither a straightjacket nor an immutable rule. We do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision.

Johnson Controls, 264 Wis. 2d 60, ¶100 (internal citations omitted).

¶125 The majority's refusal to correct Vanko's irrefutably erroneous interpretation of the law "does not comport with our duty [to exercise our constitutionally-vested 'judicial power'] because it elevates demonstrably erroneous decisions——meaning decisions outside the realm of permissible interpretation——over the text of . . . duly enacted . . . law." Gamble v. United States, 139 S. Ct. 1960, 1981 (2019) (Thomas, J., concurring). "[J]udicial decisions may incorrectly interpret the law, and when they do, subsequent courts must confront the question when to depart from them." Id. at 1984. The Vanko court not only incorrectly interpreted Wis. Stat. § 121.51(1), it also usurped the legislative function by rewriting the statute. It is this court's duty to say so. "Besides eternalizing bad law, sustaining judicial rewriting of statutes sanctions judicial usurpation of the legislative function." Town of Wilson, 390

16

Wis. 2d 266, ¶52 (Rebecca Grassl Bradley, J., concurring). This court should overturn the "demonstrably erroneous decision" it made in Vanko.

## II. The "overlapping attendance area" provision in Wis. Stat. § 121.51(1) is unconstitutional.

¶126 Overturning Vanko's reconstruction of the statute necessitates a consideration of its constitutionality, which the Vanko court avoided by expanding the "overlapping attendance area" restriction in Wis. Stat. § 121.51(1) to encompass not only religious schools but secular ones as well. On its face, § 121.51(1) denies a public benefit only to students attending religious schools in overlapping attendance areas. Private but secular schools located in overlapping attendance areas are not disqualified from receiving benefits on this basis. Denying an otherwise publicly available benefit on account of religious identity violates the First Amendment to the United States Constitution.

¶127 As it pertains to religion, the First Amendment says "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. As recently interpreted by the United States Supreme Court in Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012 (2017), and Espinoza v. Montana Dep't of Rev., 140 S. Ct. 2246 (2020), the Free Exercise Clause of the First Amendment prohibits the government from denying a public benefit solely on the basis of religious identity. Consequently, the "overlapping attendance area" provision must be struck from Wis. Stat. § 121.51(1).

17

¶128 The Free Exercise Clause, which applies to the states by operation of the Fourteenth Amendment,[5] provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. "The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" Trinity Lutheran Church, 137 S. Ct. at 2019 (quoting Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 533 (1993)). "Applying that basic principle, [the United States Supreme Court] has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" Id. (quoted source omitted).

¶129 In Trinity Lutheran Church, the United States Supreme Court scrutinized a program under which the Missouri Department of Natural Resources provided grants to help public and private schools, as well as nonprofit organizations, purchase rubber playground surfaces. Id. at 2017. The Department "had a strict and express policy of denying grants to any applicant owned or controlled by a church, sect, or other religious entity." Id. Applying this policy, the Department denied a grant application by Trinity Lutheran Church Child Learning Center——a preschool

---

[5] See Cantwell v. Connecticut, 310 U.S. 296 (1940) (holding that the First Amendment's Free Exercise Clause is incorporated against the states via the Fourteenth Amendment).

and daycare——solely on the basis that it was operated by a church. Id. at 2017-18.

¶130 The United States Supreme Court held that the Department's policy violated Trinity Lutheran's rights under the Free Exercise Clause. Id. at 2019. The Court explained that the State unconstitutionally "puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution." Id. at 2021-22. According to the Court, the State cannot "expressly require[] Trinity Lutheran to renounce its religious character in order to participate in an otherwise generally available public benefit program, for which it is fully qualified." Id. at 2024. "[W]hen the State conditions a benefit in this way, McDaniel says plainly that the State has punished the free exercise of religion: 'To condition the availability of benefits . . . upon [a recipient's] willingness . . . to surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties.'" Id. at 2022 (quoting McDaniel v. Paty, 435 U.S. 618, 626 (1978)). Choosing between "a government benefit program" and "having to disavow [one's] religious character" does not comport with the First Amendment's protection of the free exercise of religion. Id.

¶131 Just last year, the United States Supreme Court reaffirmed these principles in Espinoza. The Court held that the Free Exercise Clause precluded Montana from striking down a law establishing a scholarship program for private schools on the basis of a state constitutional provision prohibiting the

19

state from giving public aid to any school controlled by a "church, sect, or denomination." Espinoza, 140 S. Ct. at 2251-52. The Court held that the application of Montana's "no-aid provision" to the scholarship program violated the First Amendment by "bar[ring] religious schools from public benefits solely because of the religious character of the schools" as well as by "bar[ring] parents who wish to send their children to religious schools from those same benefits, again solely because of the religious character of the schools"——a fact "apparent from the plain text" of the no-aid provision. Id. at 2255. Applying Trinity Lutheran Church, the Court subjected the state's application of the no-aid provision to the "strictest scrutiny" and determined that Montana failed to advance any "interest of the highest order" by disqualifying religious schools and the children who attend them from receiving the benefits of a scholarship program solely because of their faith. Id. at 2260.

¶132 As United States Supreme Court precedent confirms, the Free Exercise Clause prohibits Wisconsin from denying otherwise generally available transportation benefits to students attending a private school "affiliated with the same religious denomination" as another private school within the same geographic attendance area. Because the plain text of the "overlapping attendance area" provision in Wis. Stat. § 121.51(1) applies only to religious schools, the statute violates the First Amendment. "The Free Exercise Clause 'protects religious observers against unequal treatment' and

20

against 'laws that impose special disabilities on the basis of religious status.'" Espinoza, 140 S. Ct. at 2254 (quoting Trinity Lutheran Church, 582 U.S. at 2021).

¶133 Trinity Lutheran Church is clear: "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" Trinity Lutheran Church, 137 S. Ct. at 2019 (quoted source omitted). The State rationalizes Wis. Stat. § 121.51(1)'s discrimination against religious schools as "set[ting] parameters" for a religiously-affiliated school's attendance area in order to avoid straining a "school district[']s . . . limited funds." The United States Supreme Court already rejected this sort of justification for religious discrimination: "A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." Espinoza, 140 S. Ct. at 2261. If the financial cost of transporting students to school trumps our right to remain free from "unequal treatment" based upon our religious identity, then the Free Exercise Clause would have little meaning.

¶134 Like Missouri's policy of "categorically disqualifying" religious organizations from receiving grants under its playground resurfacing program in Trinity Lutheran Church, Wisconsin's "overlapping attendance area" provision puts schools "to a choice: [they] may participate in an otherwise available benefit program or remain a religious institution."

21

Trinity Lutheran Church, 137 S. Ct. at 2021-22. Under Wis. Stat. § 121.51(1), if a school overlaps with another private religious institution of "the same religious denomination," that school, and its students, may either renounce their religious affiliation or lose their right to state-provided transportation benefits. The First Amendment does not permit the government to "punish[] the free exercise of religion" in this manner. Espinoza, 140 S. Ct. at 2256 (quoted source omitted). The Constitution does not countenance a religious school being forced to either forgo a "government benefit program" or "disavow its religious character." Trinity Lutheran Church, 137 S. Ct. at 2022; see Espinoza, 140 S. Ct. at 2261.

### III. Wisconsin Stat. § 121.51 impermissibly entangles the government in the affairs of religious schools.

¶135 Declaring the overlapping attendance area provision unconstitutional, as this court should have done 50 years ago when first presented with the issue, would have been dispositive of this matter. Instead, the majority persists in preserving an unconstitutional law, necessitating a response to the certified question:

> For purposes of determining whether two or more schools are "private schools affiliated with the same religious denomination" for purposes of Wis. Stat. 121.51, must the state superintendent rely exclusively on neutral criteria such as ownership, control, and articles of incorporation, or may the superintendent also take into account the school's self-identification in sources such as its website or filings with the state?

Whether applying a faithful interpretation of the statutory text or Vanko's reconstruction of the statute, there is no way to

22

answer this question without requiring the SPI to violate the Establishment Clause of the First Amendment.

¶136 In this case, the SPI must decide whether a self-described Roman Catholic school is "affiliated with the same religious denomination" as the Roman Catholic Archdiocese of Milwaukee, notwithstanding the school's professions of both corporate and theological independence from the Archdiocese. The inevitable litigation ensuing from a determination by the SPI that results in the denial of public benefits based upon overlapping attendance areas between religious schools will require judges to engage in the same inquiry concerning the religious character of schools. The Establishment Clause of the First Amendment does not permit such entanglement between church and state.

¶137 The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. In interpreting this provision, the United States Supreme Court has held that "[a] statute must not foster 'an excessive entanglement with religion.'" Lemon v. Kurtzman, 403 U.S. 602, 613 (1971). Wisconsin Statute § 121.51(1) not only fosters an excessive entanglement with religion, it compels it. Under the statute, the SPI is charged with conducting a comparative analysis to determine whether two schools belong to the same "religious denomination"——an exercise unavoidably requiring the government to interpret the nature of a particular faith. Discerning whether one religious school is "affiliated with the same religious denomination" as another forces the SPI

23

as well as the courts to delve into the meaning of "religious denomination" and what it means to be "affiliated" with one. However, it is not for the government to determine the "proper interpretation of [one's] faith." United States v. Lee, 455 U.S. 252, 257 (1982). Indeed, "[t]he prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment[.]" New York v. Cathedral Acad., 434 U.S. 125, 133 (1977).

¶138 Where, exactly, is the SPI expected to draw the line? What is a "religious denomination"? What characteristics, professions of faith, or doctrinal tenets render a religious institution part of a particular denomination? The statute doesn't tell us, and it would be unconstitutional for any state actor, including a court, to resolve the question. As the United States Supreme Court recognized decades ago, "[i]ntrafaith differences . . . are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such difference in relation to the Religion Clauses." Thomas v. Rev. Bd. of Indiana Emp. Sec. Div., 450 U.S. 707, 715 (1981). It is not for the government to determine, for example, whether a Roman Catholic school and a Ukrainian Catholic school are "affiliated with the same religious denomination" within the meaning of Wis. Stat. § 121.51(1) or otherwise. "[A] single term" like "Catholic" cannot "describe accurately the religious values and aspirations of an individual or a group of individuals. Labels work very

24

well for identifying commodities in a supermarket, but they are ill fitted for protecting the religious liberty of an individual American." St. Augustine v. Evers, 906 F.3d 591, 604 (7th Cir. 2018) (Ripple, J., dissenting).

¶139 Any governmental overriding of a religious school's profession of independence from the "religious denomination" of another school——whether made by the SPI or a court——would "require us to rule that some religious adherents misunderstand their own religious beliefs. We think such an approach cannot be squared with the Constitution or with our precedents, and that it would cast the Judiciary in a role that [courts] were never intended to play." Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 458 (1988). The government lacks both constitutional authority and institutional competence to make these determinations.

¶140 The majority does not address the entanglement problem presented by Wis. Stat. § 121.51 but mistakenly denies one exists at all. The majority says: "in determining whether schools are 'affiliated with the same religious denomination' pursuant to Wis. Stat. § 121.51, the Superintendent is not limited to consideration of a school's corporate documents exclusively. In conducting a neutral and secular inquiry, the Superintendent may also consider the professions of the school with regard to the school's self-identification and affiliation." Majority op., ¶5. The majority maintains that "accepting a school's professions that are published on its public website or set forth in filings with the state does not

25

necessarily require any investigation or surveillance into the practices of the school. It need not require any religious inquiry at all." Majority op., ¶48. The majority is wrong.

¶141 As formulated by the majority, the SPI's inquiry focuses on whether "a school is affiliated with a specific religious denomination," which obviously poses a question of a religious nature. The majority's declaration that the SPI's determination of whether schools are "affiliated with the same religious denomination" does not require any religious inquiry "at all" reflects a manner of Orwellian newspeak by which "religious" means something other than "religious." The only way for a Catholic school like St. Augustine to avoid a governmentally-decreed affiliation with the same "denomination" as another Catholic school is for St. Augustine to disavow its Catholic character.

¶142 Aside from the entanglement problem produced by the majority's decision, it offers little assistance to the Seventh Circuit in resolving this dispute. The majority notes that "St. Augustine professes that while it is Roman Catholic, it is independent of and unaffiliated with the Archdiocese." Majority op., ¶50. The majority then proclaims that "[n]either accepting corporate documents nor accepting a school's professions necessarily requires any investigation of the type prohibited by Holy Trinity or even any religious inquiry whatsoever." Id. The majority misunderstands the heart of this dispute. Although St. Augustine's corporate documents reveal no affiliation with the Archdiocese and St. Augustine explicitly disclaimed any

26

affiliation with any other Catholic school or The Archdiocese of Milwaukee in its letters to Friess Lake School District and the SPI, it professes on its website to be "Roman Catholic," which prompted the SPI to declare St. Augustine affiliated with the Archdiocese by virtue of their mutual Roman Catholic identification. That is a determination derived from a religious inquiry prohibited by the Establishment Clause. Regardless, the majority supplies no rule to resolve whether a school's corporate documents, website content, or professions of corporate and ecclesiastical independence controls the question of affiliation with a particular denomination.

¶143 The majority should have restricted the inquiry to purely secular sources such as corporate documents, leaving religious labels and alliances beyond consideration, but instead directs the Seventh Circuit to apply Wis. Stat. § 121.51(1) in a manner which impermissibly entangles the courts in matters of religion. The very precedent on which the majority relies prohibits this: "For this court or for the Superintendent of Public Instruction to determine, in the light of the prima facie showing of the articles of incorporation to the contrary, that this school corporation is or is not affiliated with the Catholic denomination is to meddle into what is forbidden by the Constitution the determination of matters of faith and religious allegiance." Holy Trinity Cmty. Sch., Inc. v. Kahl, 82 Wis. 2d 139, 150, 262 N.W.2d 210 (1978). "[T]he determination of who or what is Catholic . . . is an inquiry that government cannot make." Id. at 150-51.

27

¶144 Because the "overlapping attendance area" provision violates both the Free Exercise and Establishment Clauses of the First Amendment, it must be struck from Wis. Stat. § 121.51(1). United States Supreme Court precedent interpreting the Religion Clauses "radiates a spirit of freedom of religious organizations, an independence of secular control or manipulation——in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 186 (2012) (quoted source omitted). Within the context of this case, the Constitution reserves decisions of religious affiliation for private schools themselves, and the State may not force private schools or their students to "choose between their religious beliefs and receiving a government benefit." Trinity Lutheran Church, 137 S. Ct. at 2023 (quoted source omitted).

* * *

¶145 "The true irony of our modern stare decisis doctrine lies in the fact that proponents of stare decisis tend to invoke it most fervently when the precedent at issue is least defensible." Gamble, 139 S. Ct. at 1988 (Thomas, J., concurring). A majority of this court privileges precedent over text in preserving this court's indefensible decision in Vanko. In answering the certified question, the majority perpetuates a judicial reconstruction of Wis. Stat. § 121.51(1), which, despite the court's legislative efforts to save it, nevertheless violates the Religion Clauses of the First Amendment by

28

excluding religious schools and the students who attend them from a government benefit solely on the basis of their religion. "An odious exclusion from any of the benefits common to the rest of my fellow-citizens, is a persecution, differing only in degree, but of a nature equally unjustifiable with that, whose instruments are chains and torture." <u>Trinity Lutheran Church</u>, 137 S. Ct. at 2024 (quoting Speech by H.M. Brackenridge, Dec. Sess. 1818, in H. Brackenridge, W. Worthington, & J. Tyson, Speeches in the House of Delegates of Maryland, 64 (1829)). Repeating its error from 50 years ago, this court once again neglects its duty to strike an unconstitutional statute. I respectfully dissent.

¶146 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

29